[Civ. No. 2606.   Third Appellate District.—August 7, 1923.]

WILLIAM   H.   WHITNACK   et   al.,   Respondents,   v.
WINNIFRED M. ELLWORTHY et al., Appellants.

[1] AGENCY—GOOD FAITH—SECRET PROFITS.—One who, either for compensation or otherwise, assumes to act as an agent for another, is bound to the utmost good faith, and cannot make any secret profits or take any advantage of his position as such agent for his own benefit.

[2] ID.—EXECUTION OF NOTE AND MORTGAGE—CANCELLATION—FRAUDULENT REPRESENTATION OF AGENT—FINDINGS—EVIDENCE—APPEAL. In an action to cancel a promissory note and a mortgage given to secure the same, where the trial court found that one of the defendants was the agent of plaintiffs in an exchange of properties, that said note and mortgage were obtained from the plaintiffs by means of the false representation of their agent that in order to consummate an exchange of their property they would have to execute said note and mortgage, when such was not the fact, that said instruments were given without consideration and made in favor of a person designated by said agent as part of a scheme to secure a "secret profit" on the deal, such findings, being supported by sufficient evidence, will not be interfered with on appeal.

APPEAL from a judgment of the Superior Court of Tehama County.   John F. Ellison, Judge.   Affirmed.

E. L. Randall and W. P. Johnson for Appellants.

M. J. Cheatham and L. W. Hughes for Respondents.

HART, J.—The object of this action is to obtain a decree setting aside and canceling a certain promissory note for $2,500 and the mortgage given to secure the same.

Judgment passed for the plaintiffs, and thereafter, within due time, the defendants Ellworthy and Tracy made a motion for a new trial, which was denied.

1. Fraud and secret dealings of real estate broker as affecting commissions, note, 45 L. R. A. 33.

Right of principal to recover from broker or other agent commissions which latter received from other party to the contract, note, 28 L. R. A. (N. S.) 952.

This appeal, supported by a record prepared in conformity with the alternative method, is by the defendants, Ellworthy and Tracy.

In their brief counsel for respondents set forth a correct statement of the general facts of the case, which is herein adopted as follows:

"During the early part of the year, 1921, W. F. Whitnack and his two sons, Bill, or W. H. Whitnack, and Guy Whitnack, each owned land in Canada. W. F. Whitnack, the father, came to Corning, Tehama county, California, and moved upon a tract of land in May, 1921, which he had purchased. The defendant Omer Tracy in the summer and fall of 1921, went to Canada and there became acquainted with the plaintiff, W. H. Whitnack, and during the harvesting season said Tracy assisted in the threshing on W. H. Whitnack's place, during which time defendant Tracy and W. H. Whitnack became very well acquainted with the lands of said W. H. Whitnack and the personal property thereon. During his stay in Canada Tracy frequently talked with the plaintiff relative to trading said plaintiff's property in Canada for Corning, California, property and represented to plaintiff that he was a real estate agent in Corning. On the 19th of October, 1921, when leaving Canada, it was agreed between plaintiff Whitnack and said Omer Tracy that Tracy would look up a trade for Whitnack, and that his father, W. F. Whitnack, being a resident of Corning, would look over any property that Tracy might find for trade, and report. In the latter part of October or early part of November, after Tracy had returned to Corning, he submitted three propositions to W. F. Whitnack, concerning a trade for W. H. Whitnack's Canada lands. The only proposition that appealed to the father was the trade that was consummated, which was the property of an old English couple by the name of Prentice, and known as the Prentice property.

"In the consummation of the deal a conveyance was executed by George C. Prentice and Sarah Prentice, his wife, conveying their ten-acre tract at Corning to plaintiffs W. H. Whitnack and Emily Whitnack, his wife. A transfer was made by the Whitnacks, under the Canadian law, of their 320 acres near Veteran, Alberta, Canada, to the said Prentices, the Prentices assuming a $2500 mortgage on said tract

and the Whitnacks executing a note and mortgage for $2500, covering their newly acquired Prentice property at Corning, in favor of Winnifred M. Ellworthy, a young lady who was a member of Tracy's family."

To the above statement it should be added that the Prentices, after agreeing to the exchange of their Corning property for the Canada property of the Whitnacks (plaintiffs), executed an agreement of sale of their property to Tracy. This agreement will later be more fully explained herein.

A brief but accurate statement of the case and the issues as made by the pleadings is contained in the opinion filed by the learned trial judge giving the reasons for the conclusion embodied in the decision of the court, and this statement, which is as follows, we also adopt:

"The complaint alleges that the plaintiff William H. Whitnack, a few days' prior to the 18th of November, 1921, employed the defendant Omer Tracy, as his agent, to negotiate the exchange of certain lands the plaintiffs owned in Canada for some lands near the city of Corning; that said Tracy, pursuant to said employment, entered into negotiations with Sarah Prentice and George Prentice for the exchange of their tract of ten acres of land, situate in the County of Tehama, State of California, near Corning, and describing it; that the said Prentices agreed with the said defendant Tracy to exchange their ten-acre tract of land free and clear of all encumbrance for the tract of land of the plaintiffs with an existing mortgage against the same for the sum of $2500.00; that the defendant Tracy represented to plaintiffs that said Prentices would not exchange their ten acres of land unless said plaintiffs would give a mortgage on said ten-acre tract in the sum of $2500.00; that this representation was false and untrue and said Tracy knew the same to be false and untrue, but, plaintiffs, believing the same to be true, executed a note and mortgage for $2500.00. The plaintiffs allege that the note and mortgage were made to the defendant Winnifred M. Ellworthy. They allege that said note and mortgage were made because of the fraudulent representations of the defendant, Tracy, while acting as their agent and were made without consideration.

"The answer denies the agency of the defendant Tracy; denies he represented to plaintiffs that the said Prentices would not exchange their said ten acre tract of land unless

the plaintiffs gave them a mortgage for $2500; the defendant Tracy alleges that he had a contract with the Prentices, dated November 22d, 1921, by which they had agreed to sell to said Tracy their said land, being the land described in the complaint; and that, after the making of the said contract by the said Prentices to the said Tracy, they made no transfer of said property except in accordance with the directions of said Tracy, under the provisions of their said contract with him."

The complaint, in addition to the facts stated in the above excerpt, alleged that the deed from the Prentices and the note and mortgage from W. H. Whitnack and wife to the defendant Ellworthy were delivered by the defendant Tracy into the custody of one W. L. Bransford, with instructions to the latter from said Tracy that he (said Bransford) cause the same to be recorded in the office of the county recorder of Tehama County. In his answer to the complaint, said Bransford admitted having possession of the several instruments mentioned, that they were given to him with instructions to cause the same to be recorded, and "that he has no further interest in the above-entitled action and now delivers the said deed and mortgage to the clerk of this court to abide the decision of said court."

The findings accord with the claims of the complaint.

The single point urged for a reversal is that the findings are not supported by the evidence.

The specific contention of the plaintiffs is that Tracy, in the transactions resulting in the exchange of the properties, acted as an agent of the plaintiffs upon a distinct and definite agreement that for his services in conducting and consummating the deal, he was to be given by the plaintiffs a binder and cultivator of the value of $200; that the mortgage exacted and received by Tracy from plaintiff on the Prentice property was no part of the consideration for which the Prentices agreed to the exchange, but that the procurement of said mortgage and causing the same to be executed in favor of Miss Ellworthy was part of a fraudulent scheme by Tracy to secure a "secret profit" on the deal.

The defendant Tracy contends that, in the several transactions eventuating in the exchange of properties between the Prentices and the plaintiffs, he was not acting as the agent of the latter but was acting for himself, the property

exchanged for that of the plaintiffs having been taken over by him from the Prentices without regard to a sale or exchange of same to or for the property of any particular person. This position is sought to be supported in part by the fact of the making of the agreement whereby, so it is claimed by Tracy, the Prentices sold their property to him.

There is ample testimony to uphold the findings that W. H. Whitnack, while Tracy was in Canada, authorized the latter to act for him in effecting an exchange of his property in Canada for property situated at or near the town of Corning, this state, and that, as commission for Tracy's services for consummating a satisfactory trade, said Whitnack was to give Tracy a binder and cultivator; that, as above stated, said Whitnack instructed Tracy to submit any bargain in the way of a trade he might be able to make to his (said Whitnack's father and brother, then residents of Corning, and that Tracy replied that he would do so and have them (father and brother) "look everything over."

As to what occurred after Tracy's return to Corning, in so far as W. F. Whitnack took any part therein, the latter testified that, in the month of November, 1921, Tracy called on and submitted to him three different propositions for the exchange for his son's property, one being the Prentice tract; that he (the witness) stated to Tracy that he would look at the Prentice place for the purpose of determining whether, in his judgment, it would amount to a satisfactory deal, but that Tracy protested against the witness going to the Prentices at all, saying: "No, don't go about the place. . . . The less said to them [the Prentices] the better. They want to trade, but they are old, childish people, and they believe anything I tell them; and you just stay away, and I will make the deal all right"; that, notwithstanding this protest by Tracy, he (the witness) nevertheless went to the Prentice land and looked it over; that witness then proposed to Tracy to trade his son's Canada land, subject to the mortgage subsisting thereon, for the Prentice place as it then stood, clear of encumbrances, and Tracy said he thought he could make that kind of a deal; that later Tracy said to witness that the Prentices would not trade unless a mortgage were given on the Corning property to offset that on the Canada property; that the trade was finally made on that basis; that a deed and a bill of sale for certain personal property were sent to

his son for execution; that he (witness) did not see the mortgage executed on the Prentice property until after the trade was completed; that he supposed the mortgage was given to the Prentices prior to the time his son arrived in Corning.

Mrs. Prentice testified that she did not receive the note and the mortgage executed by W. H. Whitnack and wife on the Prentice property; that she did not know that the Whitnacks were to give a mortgage. "We had nothing to do with the transaction whatever," she continued. "We turned it all over to Mr. Tracy." She said that she was depending upon the contract she and her husband made with Tracy; that she turned everything over to Tracy to do with as he saw fit; that they turned their place over "free of encumbrance and don't expect any encumbrance on the other, either"; that she "expects Miss Ellworthy will pay off the mortgage in Canada; that is the understanding; we fully trust Mr. Tracy. . . . We have known him and always have known him as an honest man."

Tracy testified that he is the owner of two places in Canada in the neighborhood of W. H. Whitnack's property; that the Prentices stated to him that they would like to go with him to Canada "the following summer"; that he then proposed that they sell their Corning property to him and "trade it off for something in Canada"; that the Prentices agreed to this proposition and thereupon signed the written agreement with Tracy whereby it was "agreed that said parties of the first part [Prentices] have sold to party of second part what is known as the Prentice Home, . . . Maywood Colony No. 2 (near Corning, California); it is agreed that party of the second part shall trade the property bought from parties of the first part . . . for Canadian property in the neighborhood where party of the second part now owns property." The agreement further provides that, after the first parties have been in Canada and investigated conditions and decided whether or not they wish to live there, they shall then have their choice of taking the Canadian property or a cash consideration in payment of the Corning property. This agreement was dated November 2, 1921. Tracy testified that, after said agreement was made, the father of plaintiff Whitnack approached him on the proposition of securing a trade of his son's Canadian

property for property near Corning; that he (Tracy) called W. F. Whitnack's attention to the Prentice property, and at the request of Tracy, said Whitnack inspected said property; that, after some negotiations, he (Tracy) and said Whitnack agreed upon the trade and definite terms, which were that the Prentices were to take the Canadian property, subject to the mortgage, and that W. H. Whitnack was to take the Prentice property upon which, however, as an offset to the mortgage on his property, he was to give a mortgage in the sum of $2,500. After this agreement was made Tracy prepared a mortgage to be executed by the plaintiffs on the Prentice property, and he testified that, being compelled to go to Sacramento immediately upon completing the preparation of the instrument, delivered the same to his wife with instructions that she forward it by mail to the plaintiffs in Canada. The mortgage and the note for $2,500 which it was given to secure was, as before stated, to Winnifred M. Ellworthy, as mortgagee, and the instrument was dated November 18, 1921.

Tracy testified that, in the agreement with W. F. Whitnack, he (Tracy) reserved the right to have the mortgage on the Prentice property to be taken in the name of any person whom he elected to choose and who would take it; that, after discussing this feature of the transaction in the presence of Miss Ellworthy, the latter stated that she owned certain Canadian securities and some cattle in Canada, and that she would take the mortgage and agree to pay off the Canadian mortgage; that Miss Ellworthy was willing to do this because she could make a good profit on the deal from the difference between the Canadian and American exchange. This agreement between Tracy and Ellworthy, so the latter testified, was verbally made at the time of the preparation of the mortgage on the Prentice property, but was not reduced to writing until the twenty-fourth day of December, 1921, a trifle over a month after the date of the preparation of the mortgage. Miss Ellworthy corroborated the testimony of Tracy as to conversations leading to her taking of the Prentice mortgage, the making and the writing of the agreement first referred to and the fact of the preparation of the mortgage.

The foregoing constitutes a synoptical recital of the salient facts brought out at the trial which directly concerned the

real bone of contention between the parties. There was introduced in evidence, however, a letter, purporting to have been written to W. H. Whitnack, in Canada, by defendant Tracy, on the eighteenth day of November, 1921. This letter, as the trial judge suggests in his written opinion filed in this case, is, as will presently be perceived, particularly important in the matter of determining the weight or credit to be attributed to the testimony of the several witnesses who testified to vital facts in the case. The following is the letter:

"Corning, Calif., Nov. 18, 1921.

"Mr. William H. Whitnack,

"Veteran, Alta.

"Dear Sir:—

"George Prentice and his wife Sarah Prentice, have completed their deed to you and wife, also bill of sale, of personal property, of which you will find a list herewith enclosed. There is one item that was over-looked, and that was the chickens, however I will get a separate bill of sale for them.

"I have now in my possession, the transfer and bill of sale, from you to George Prentice, also the warantee deed, and bill of sale from George Prentice, to you and your wife in my possession.

"I worked hard yesterday all day; One of them bowed up, because your Ford car was not on the bill of sale, it being on the list of the personal property you sent down here, and I gave them a copy of the list and them being English, they could not get the Ford car out of their heads. And I talked this matter over with your Father and Guy and desided I would have the papers made out, and promised them that you would send them a bill of sale of the Ford.

"I will send to Akhurst in Veteran a Note and Mortgage for $2500, for two years from August 1st, 1921, at .06% as soon as I get one and get it filled out. I will have him phone you, as soon as it arrives you and your wife sign it, as boath of your names is on the deed here. Return it and the bill of sale of the Ford to me and I will turn over your deed and bill of sale, from George Prentice and wife, to you and wife. I will turn those papers over to your Father, and

the papers you have made out to Prentices, we will have recorded.

"You can also send me a bill of sale of the 'Deering Binder' and the cultivator. I guess your father has explained this, take them over to my place, or get Jim to, and you get the McCormic Binder, the canvasses are in the guarage, that belong to it and leave it with your machinery that Prentices get.

"Yours truly,

"OMER TRACY."

· Miss Ellworthy testified that the foregoing letter was dictated to her by W. F. Whitnack and that she wrote it as it was so dictated, and then subscribed thereto Tracy's name; that Tracy was not in Corning on the eighteenth day of November, 1921, but that, as before stated, he left on the night of the 17th of November, 1921, after preparing the deed to be executed by the plaintiffs to their Canada property, for Sacramento, and was absent from his home for three days; that Tracy, upon returning to Corning and learning that the letter had been written and his name signed thereto, became very angry and reprimanded the witness for signing his name to the letter without his authority. Tracy positively declared that he did not write the letter, nor authorize anyone to write or sign his name thereto.

W. F. Whitnack, called in rebuttal, testified that he was at Tracy's house in the forenoon of the eighteenth day of November, 1921, and met Tracy there; that he also met him on the afternoon of the 18th when he (Tracy) called at the house of the witness; that he (witness) did not write or dictate the above letter and that he knew nothing about the letter.

Mrs. W. F. Whitnack, wife of the last-named witness, and mother of W. H. Whitnack, testified that she saw Tracy at her home at Corning on the afternoon of the eighteenth day of November, 1921.

The learned trial judge, in his written opinion herein filed, scrutinizingly examines the contents of said letter, and points out certain statements therein relative to subjects with which W. F. Whitnack could not have been familiar without receiving information thereof from some other person—for instance, matters of which knowledge

could not have been obtained except through someone who was in Canada, or had recently been there. Moreover, the learned ·judge made careful comparison of the handwriting characterizing the above letter with the admitted handwriting of Tracy as the same was exhibited by other letters introduced in evidence, and concluded that the handwriting of the letter in question and Tracy's signature thereto were precisely the same as the handwriting of and his signature to the other letters, admitted to have been written by him. Judge Ellison, in his written opinion, thus sums up his views as to the testimony upon the question of the author-·ship of said letter, and, furthermore, satisfactorily considers, discusses, and disposes of the whole case as follows, and we adopt the same as a part of this opinion:

"Exhibit Three [the letter in question], in and of itself, does not seem to be a very important document in the case, but it becomes immensely important as bearing upon the weight to be given to the testimony of the two defendants. Their denial of the authorship of this letter and their testimony that it was dictated by Mr. W. F. Whitnack make it the duty of the court to view the case they have attempted to present in court with the greatest suspicion and distrust and to very largely discount their testimony on other matters.

"Viewing the testimony in the case in the light of these preliminary observations, the court is of the opinion that the allegations of the complaint are true; that the testimony of the plaintiff's witnesses to the effect that the defendant Tracy, while in Canada last October, offered and agreed to make a trade for the plaintiff Wm. H. Whitnack of his Canada property for property near Corning is true; that the evidence is equally true that, while occupying such fiduciary relation, the defendant Tracy is attempting to confer upon himself a secret profit to the extent of the note and mortgage in the sum of $2500.00; and that he could have obtained the Corning property for the plaintiffs without a mortgage on it is demonstrated in many ways from the testimony. His first statement to the father of the plaintiff W. H. Whitnack was that he could make such a · trade, and his subsequent conduct in the manipulation of documentary evidence shows that, so far as the Prentices are concerned, such trade was made. It does not appear

that the Prentices ever requested the giving back of a mortgage on the Corning property, or that they knew anything about there being a mortgage outstanding until this controversy arose. If it were true that the $2500 was to be given to the Prentices as a part of the trade, it is inconceivable that the mortgage and note were not made payable to them, instead of to the defendant Ellworthy. The evidence shows that the defendant Ellworthy is a young woman who has lived in the family of the defendant Tracy for many years and is a member of his household, and the evidence is equally clear that she is simply acting as a depositary of the note and mortgage for the benefit of the defendant Tracy. The pretense—and it is only a pretense—that they intend to use the money obtained from this mortgage to pay off the mortgage on the Canadian property does not impress the court. The Prentices have no written agreement of any kind or description with either of the defendants binding themselves to use this money for their benefit, and the only document is the document executed between the two defendants containing a statement of what they propose to do with the money—a document apparently unknown to the Prentices, or anybody else, until the time this controversy arose, and a document which they can destroy at any time that suits their convenience.

"The note and mortgage of $2500 were taken for the benefit of the defendant Tracy as his secret profits to be made on the transaction. A judgment canceling the note and mortgage will not in any way injure the defendant Ellworthy, because from her own testimony she has never invested a dollar in it, in money or property. Nor will it be injurious to the Prentices, who are not parties to the suit. They have a written contract with the defendant Tracy that when they examine the Canada property if it does not suit them they are under no obligations to take it, but he is to find them another property, or pay them the cash value of the Corning property. Perhaps when they see it, with a $2500 mortgage on it, they will exercise their option and decline to accept it, and demand the money, or other property, from the defendant Tracy. They have thus far been willing to trust him, and the court is justified in leaving them rely on the contract they have voluntarily made with the defendant Tracy.

"If the defendant Tracy takes the position that he was not acting as the agent of the plaintiffs, but was selling to them his own property, or property which was in effect his by purchase or contract from the Prentices, then he is in no better position, because it would have been his duty in that event to have told the plaintiff, or his father, frankly that he was not negotiating for a piece of land belonging to some one else, but that he had an interest in the property he was trying to sell the plaintiffs, and they would have been on their guard and would have had to exercise their own judgment as to the value of the property and the fairness of the contracts to be entered into.  The Whitnacks both testify that never at any time did he tell them he owned or had an interest in the Prentice property, and I accept their statements as true.

[1]  "The law is well settled that one who, either for compensation, or otherwise, assumes to act as an agent for another, is bound to the utmost good faith, and cannot make any secret profits or take any advantage of his position as such agent for his own benefit.  See *Kevane* v. *Miller*, 4 Cal. App. 598 [88 Pac. 643]; *Ritchey* v. *McMichael*, 4 Cal. Unrep. 384 [35 Pac. 151].  This last case also shows that a plaintiff can recover the secret profits being made by a defendant without rescinding the contract.  In this case it is said: 'The relation of vendor and vendee never existed between them, nor was there ever any contract between them which required a rescission.  The defendant could not, so long as he held the relation of agent to the plaintiff for the purchase of these lands, acquire any interest therein which he could hold as against the principals, or of which he could become the vendor.'

"In the case of *Laurence* v. *Kilgore*, 154 Cal. 310 [97 Pac. 760], it is said: 'Where an agent buys land for his principal and fraudulently represents to him that the purchase price was an amount in excess of the sum actually paid by the agent, an action by the principal against the agent to recover the portion of such excess as was paid to him in money and to cancel a note given for the purchase is not one for the rescission of the contract of purchase, and the principal as a condition precedent to maintaining the action is not required to return the land.'

"The further claim is made that W. F. Whitnack, the father of the plaintiff, acted as his agent, and that whatever he did is binding upon the plaintiffs. His father never accepted employment to negotiate a trade of his property. The doing of that work had been placed in the hands of the defendant Tracy. The plaintiffs were not in California to examine any property that was offered to them by the defendant Tracy, as their agent, and to determine from an inspection of it whether it was worth the price that was asked. His father was here, and he was his agent to the extent of either approving or disapproving any transfer that might be suggested by the plaintiff's agent, Mr. Tracy. The plaintiffs' right to recover is not defeated by the fact that the plaintiff [W. H. Whitnack] or his father acting for him, agreed to give the mortgage for $2500 on the Corning property. His right of action is based upon the proposition that the note and mortgage were not given to the Prentices as a part of the purchase price of the property, but, unbeknown to either the plaintiff, or his father, was given to the defendant Ellworthy for the use and benefit of the defendant Tracy in the action.

"The further allegation of the complaint that the note and mortgage were given without consideration is also sustained by the evidence. The Prentices did not require such note and mortgage, knew nothing about it, they were not made in their name, and so far they have received no benefit from them, and if they remain uncanceled, there is nothing to show that they ever will receive any part or parcel of the money represented by the note and mortgage."

[2] It may be suggested that had the judgment gone the other way, upon the record as it stands—that is, if the defendants had been victorious in the controversy—this or any appeal court by which the case might have been properly considered would be in no better position to reverse the judgment upon the ground that the findings were unsupported than we are here. But the question of the credibility of witnesses or the weight or probative value of their testimony is, as is well known, peculiarly one for solution by the trial court or jury, according to the mode of trial. In this case, the judge had the witnesses before him, and thus had an opportunity, not available to courts of review, to observe the manner in which they gave their testimony and so de-

termine whether their stories on the witness-stand were true or false. From the judge's written opinion, as also from the court's findings, we are authorized to presume that the testimony of Tracy and Ellworthy was rejected by the trial court as unworthy of belief, while that presented by plaintiffs was accepted as involving a truthful statement of the transaction. There is no inherent infirmity in the stories told by the witnesses for the plaintiffs, while, on the other hand, the trial court, in the performance of a function . which is, with manifest wisdom, committed to it, has found that a very serious infirmity characterized the testimony of the defendants—that is, that it was and is untruthful. In such a situation a court of review has no legal right to interfere with the trial court's decision upon the ground that it is without evidentiary support.

The judgment is affirmed.

Burnett, J., and Finch, P. J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 4, 1923.