[Civ. No. 3338. Third Appellate District.—January 19, 1928.]

C. E. PATTERSON, Respondent, v. D. O. DE HAVEN, Appellant.

James T. Matlock for Appellant.

W. P. Johnson for Respondent.

PLUMMER, J.—Plaintiff had judgment against the defendant in the sum of $1,000 alleged to be due the plaintiff from the defendant for and on behalf of commissions earned in the sale of a certain band of sheep belonging to G. C. Long and his brother, J. R. Long. From this judgment the defendant appeals.

The complaint is in three counts. Judgment went for the plaintiff upon the first count, and as the findings of the court are simply general and to the effect that all the allegations of the first count of plaintiff's complaint are true and correct, it is necessary to set forth the same, which we do, as follows:

"I.

"That on the —— day of July, 1925, plaintiff had an exclusive option to purchase from G. C. Long and J. R. Long 2800 head of ewes, or thereabouts at the price of

$13.00 per head. That thereafter the price was reduced by the said G. C. Long and J. R. Long in this, that they agreed to take for 200 of said ewes the sum of $9.00 per head. That under the terms of said option plaintiff was to have the right to buy said ewes at said price or to sell the same, and in case of sale during the life of said option plaintiff was to be paid by the purchaser his profit or commission, and that no commission was to be paid to the said plaintiff by said Longs.

"II.

"That plaintiff offered said ewes to defendant for sale at said price, stating to him the terms of his said agreement with said Longs; plaintiff's commission or profit on account of said sale to be $250.00. That defendant agreed to take said ewes at said price and pay said Patterson the said sum of $250.00 if the said Longs would make no further reduction in the price of said ewes, but that if said Longs did make a further reduction in the price of said ewes he agreed that he would pay said Patterson as his profit or commission in making said sale the amount of the reduction made by said Longs, instead of the said commission of $250.00. That said Patterson agreed to this.

"III.

"That after said reduction by said Longs and on or about the first day of August, 1925, said defendant purchased from said Longs the said ewes. That he paid the said Longs for said ewes as follows: $9.00 per head for 200 of said ewes, $12.00 per head for one thousand of said ewes, and $13.00 per head for the balance of said ewes. That the said Longs reduced the price on 1000 of said ewes $1000.00, and in accordance with said agreement between plaintiff and defendant there became due to plaintiff from defendant on the purchase of said ewes at said reduced price the sum of $1000.00. That said ewes were delivered to said defendant by said Longs on or about the 10th day of November, 1925, that the number of ewes so delivered was 2757 head. That defendant paid to said Longs the amount said Longs were to receive on account of the purchase of said ewes.

"IV.

"That the said sale was made during the life of said option. That before the sale was made to the said defendant

plaintiff told the said Longs the arrangement he had made with the said defendant, and that under the terms of the said arrangement $1000.00 was to be paid to him by the said defendant. That the said Longs made the said sale direct to the said defendant with the agreement on the part of said defendant that he was to pay the said plaintiff in accordance with his agreement as above set forth."

No testimony was introduced in relation to counts 2 and 3, and no findings were made thereon. Upon the conclusion of plaintiff's case the defendant moved for a nonsuit, which was denied. Defendant also interposed a motion for a new trial after the rendition of judgment herein, which motion was also denied. This appeal raises questions as to the correctness of the ruling of the trial court upon the defendant's motion for a nonsuit; also, on the motion for new trial and the sufficiency of the testimony to support the findings of the court. The point is also made that the findings and judgment are against law.

Before going into the legal questions involved, it may be stated that there is no evidence whatever in the transcript to support the finding of the trial court that paragraph I of plaintiff's complaint is true. The plaintiff's own testimony in this particular is as follows: "Q. What arrangement did you have with G. C. and J. R. Long in regard to the sale of sheep belonging to them? A. Well, about the first of July, 1925, he (referring to one of the Longs not named) was over to my house one day and he wanted to know if I could sell the ewes for him; that was about the second or third of July, 1925, and I asked him when he wanted it, and he said if he could get $13.00 net a head he would sell them and that there would be about 2800 head, and I said, 'Will you give me an exclusive option on them until the 25th of July, to sell them,' and he said, 'Yes, and if they are not sold then, we can extend it,' and I said I thought I could sell them for him. Q. Were you figuring on buying them for yourself or selling them? A. I figured on selling them at a profit; I priced them to everybody at $13.50." There is no testimony in the record to the contrary; that the plaintiff simply had an option, or, in other words, was acting in the capacity of an agent to sell the band of sheep for the Long brothers. That this is true is further evidenced by one of the paragraphs, which we take from the opinion of the

trial court set out in the transcript as follows: "The evidence is undisputed that plaintiff was given an option to sell the sheep of Grover and Joe Long at $13.00 per head; that he interested defendant in the sheep and was to get 50 cents per head; that the Longs were not to pay him anything by way of commission or otherwise; that later the price was reduced to $9.00 per head on 200 ewes, and still later a reduction was made of $1.00 per head on 1000 head of ewes." When the findings of fact were signed the testimony which we have quoted and the views of the trial court as to the testimony expressed when deciding the case appear to have been overlooked.

The first paragraph of plaintiff's complaint and the findings of the court to which we have referred were apparently both based on the opinion of this court in the case of *Flint* v. *Giguiere*, 50 Cal. App. 314 [195 Pac. 85]. This case is set forth in the trial court's opinion and also in the brief of respondent herein as supporting the judgment. However, as the testimony which we have quoted shows conclusively that the appellant had only an option to sell, the case of *Flint* v. *Giguiere* is not an authority here. The difference between the case at bar and the cause of *Flint* v. *Giguiere* is readily perceived by reading the first paragraph of the opinion in the. latter case. It is "that within two years last past, the plaintiff and D. B. Woods entered into a contract whereby the said D. B. Woods agreed to sell and deliver to the plaintiff 365 head of cattle," etc. The opinion then goes on to state that the contract which gave the plaintiff the option to buy said 365 head of cattle was sold to the defendant, the defendant agreeing to pay $1 per head for said cattle. Flint negotiated with Woods as a purchaser and he was given the right to purchase. He did not negotiate with Woods and obtain an option simply to sell the cattle for Woods at so much per head. In the Flint case the plaintiff was an independent contractor having the right to purchase the 365 head of cattle within a certain period of time, and he simply sold his contract right to the defendant in the case referred to for the sum of money therein named. No question of agency was involved in the Flint-Giguiere case. Here the very inception of the negotiations created the relationship of principal and agent between the plaintiff and the Long brothers. After this relationship had been established, the plaintiff looked up the defendant and offered

him the sheep at $13.50 per head. The defendant went to the ranch or range where the sheep were kept, examined the same, and in negotiating with one of the Long brothers a reduction to $9 per head was made on 200 head of sheep on account of their age. After this had taken place the defendant and the plaintiff had an interview which is related by the plaintiff as follows: "Ollie (referring to the defendant), said, 'The bank won't let me buy only for $13.00, and I said it was all off and went and stopped in front of our office and talked a few minutes and then went and sat on the bench in front of Fisher's, and Ollie wanted to know if I thought they would not come down a little more, and I told him no.' Q. He told you he would not pay more than $13.00? A. He said the bank would not let him pay over $13.00. Q. That was after the reduction was made on the 200? A. Yes. Q. And then you told him the sale would have to be off, or the deal would have to be off? A. Yes, we sat on the bench and talked a little bit, and I told him I didn't think so, that Joe had told me that if he couldn't get $13.00 they wouldn't sell them, and that he had concluded not to sell them anyway, and Ollie (referring to the defendant) said, 'I believe they will come down some more, but if they won't come down some more, I will give you $250 profit on it, and give it to you some other way, but if they will come down, I will take them and save my two hundred and fifty, and whatever they come down will be yours.' Q. And the arrangement with Longs was two hundred at $9.00—and then if they were sold at that rate to De Haven what would you get on them for commission. A. I wouldn't get any on them. Q. And then he made this proposition, that he would take then on the $13.00 proposition instead of the $13.50? A. Yes. Q. There had already been a reduction on the two hundred, you stated? A. Yes. Q. And as added to that he was to pay you two hundred and fifty dollars commission, is that right? A. Yes, he said, 'I will take them, but I will go back up there, and if they won't come down any more I will take the sheep and pay you the two hundred and fifty dollars profit, but I think they will come down on that, and whatever they come down will be yours, and I will save my two hundred and fifty dollars.' " Upon cross-examination the plaintiff testified in relation to this transaction as follows: "Q. I understood you

to say in front of Johnson's office, or in front of Fisher's store, De Haven said, 'I can't pay but $13.00 for the sheep, do you suppose they will come down,' and you said, 'I don't think so,' and you sat down there, and finally De Haven said, 'I will take the sheep at $13.00, and I will give you $250.00, but if I can get them to come down you can get the profit,' and that you went and told the Longs that, didn't you? A. I didn't tell them anything of the kind. I never said a word to them until they knocked them down a thousand dollars."

After this agreement had been entered into between the plaintiff and the defendant relative to the plaintiff receiving whatever might be the drop on the price of the sheep, the defendant entered into negotiations with Joe Long, one of the owners of the sheep, and secured a reduction on 1,000 head of said sheep in the sum of $1 per head. It is this drop in the price, as it is frequently called in the testimony and the briefs, that constitutes the basis of the plaintiff's action. The transcript further shows that the agreement as to the price of the sheep was made by the Longs on the ranch or range where the sheep were kept, and that after such arrangements the parties all came down to the town of Red Bluff and there the money was paid over. The sheep were kept at a place called Bartels. The testimony of Grover Long as to when he obtained notice of the commissions claimed by the plaintiffs is as follows: "Q. He told you that De Haven would take the sheep at $13.00 and pay him a commission of $250.00, but that if he could get you to come down, he was to have the drop? A. I don't know as he told me that he was to have the drop, but he said that he was satisfied that De Haven would take the sheep at $13.00. Q. Was that at Bartels? A. Yes. Q. Why did you drop down? A. That was done—my brother done that after I left there. I wasn't at Bartels when the deal was made. Mr. Patterson got there in the evening and I left there the next morning. Q. Did you tell your brother that then? A. I wouldn't say whether I did or not. If I did, I don't remember it." The brother, Joe Long, who negotiated the sale of the sheep at Bartels and had agreed with the defendant to reduce the price on 1,000 head thereof from $13 to $12 per head, testified in relation to the transaction under inquiry as follows: "Mr. De Haven never told me he would

take the sheep until after we got to Red Bluff. He said nothing to me about the sheep until we got to Red Bluff. Mr. Patterson came to me in the mountains that morning before we left, and he had been down to Mr. De Haven's Camp, and he said that Mr. De Haven and he had agreed on $250.00, and that they would fix the deal up satisfactory to everybody down there. Q. Did he say anything to you if you dropped any that he would get the drop? A. No, I don't remember about that. Q. When did you first hear about that, that he was to get the drop? A. Well, after we closed the deal with the sheep. Mr. Patterson told me, I believe the morning before we left Bartels when we went to see Mr. De Haven, that he was to get $250.00 and when we got to the Valley we would fix it up satisfactorily down there. Q. Did you hear that if you dropped in the price of the sheep that Patterson was to get the benefit of the drop? A. Yes, Mr. Patterson told me that. Q. When did he tell you that? A. After we closed the deal here. Q. You never did know that De Haven would give you $13.00 regardless of the drop? A. No. Q. You never knew it until afterwards? A. No. Q. If you had held up the price you would have gotten $13.00 for the sheep? A. I don't know that. Q. Mr. Patterson told you afterwards? A. Yes, Patterson told me afterwards. Q. He told you after the money was paid? A. Yes, sir. Q. And not before? A. No, sir.''

Section 2020 of the Civil Code reads: ''An agent must use ordinary diligence to keep his principal informed of his acts in the course of his agency.''

This section of the code and the principle there stated has received consideration at the hands of this court a number of times. The first case coming to our attention is that of *Tate* v. *Aitken,* 5 Cal. App. 505 [90 Pac. 836]. In that case an agent was given authority to sell a parcel of real estate for $1,000 or such less sum as the vendor might agree to receive. The remuneration provided for was such sum as the agent might receive in excess of the selling price agreed upon by the vendor. After the relationship of agent and principal had been established, the agent represented to the vendor that he had a buyer who was willing to pay the sum of $800 and no more. The agent in fact had a buyer for the sum of $1,300, at which sum the property was actually sold. After learning these facts, the plaintiff brought an action

to recover the sum of $500, being the difference between the represented selling price of $800 and the actual selling price of $1,300. The plaintiff had judgment for the sum of $200. Upon appeal the judgment was affirmed. It was there held, as we must hold here, that the agreement did not give the agent an option to buy, but only an option to sell, and it was the duty of the agent to make full disclosure. Again, in *Curry* v. *King*, 6 Cal. App. 568 [92 Pac. 662], in an action involving a purchase by the agent who had been given only authority to sell, it was held: "The relation of an agent to his principal is fiduciary in nature, and he is bound to treat with his principal concerning the property over which he has been invested with authority in the utmost good faith, and if he fails to show such good faith affirmatively, a transaction whereby the agent acquired the ownership thereof is deemed by law to be fraudulent." A number of cases are cited on page 576 of this opinion supporting the rule which we have just stated, and then the following quotation is taken from the case of *Rubidoex* v. *Parks*, 48 Cal. 215: "The agent and principal are not absolutely prohibited from dealing with each other with respect to the subject matter of the agency or trust; but in all their dealings with each other the utmost good faith is required, and the burden of proof is on the agent to show affirmatively that he acted in good faith, fairly and honestly."

In *Whitnack* v. *Ellsworthy*, 63 Cal. App. 411 [218 Pac. 631], in considering the relationship of principal and agent, this court, speaking through Justice Hart, used the following language: "The law is well settled that one who, either for compensation or otherwise, assumes to act as an agent for another, is bound to the utmost good faith, and cannot make any secret profits or take any advantage of his position as such agent for his own benefit." (Citing *Kavene* v. *Miller*, 4 Cal. App. 598 [88 Pac. 643]; *Richey* v. *McMichael*, 4 Cal. Unrep. 384 [35 Pac. 151].) The opinion further cites the case of *Lawrence* v. *Kilgore*, 154 Cal. 310 [97 Pac. 760], to the effect that where an agent to buy secretly buys for a less figure than that represented to his principal, the principal may recover the excess paid on account of such misrepresentation. Likewise, in *Nielsen* v. *Richards*, 75 Cal. App. 680 [243 Pac. 697], this court, in considering the relationship of principal and agent stated the rule as follows:

"The doctrine is familiar, and has been often recognized by this court, that an agent cannot, either directly or indirectly, have an interest in the sale of the property of his principal, which is within the scope of his agency, without the consent of his principal, freely given, after full knowledge of every matter known to the agent which might affect the principal. (Citing *Coat* v. *Coat,* 63 Ill. 74; *Ebelmesser* v. *Ebelmesser,* 99 Ill. 548; *Ziegler* v. *Hughes,* 55 Ill. 288; *Hughes* v. *Washington,* 72 Ill. 85.) It is of no consequence in such cases that no fraud was actually intended, or that no advantage was in fact derived from the transaction by the agent." (Citing Kerr on Fraud and Mistake, 173, 174; Perry on Trusts, par. 206; Story's Equity Jurisprudence, par. 315; Bispham's Equity, 2d ed., par. 338, p. 299.) The rule is not merely remedial of wrong actually committed. It is intended to be preventative of wrong. "Public policy requires, as was tersely and forcibly stated by the chief justice in *Staats* v. *Bergen,* 17 N. J. Eq. 554, that 'a trustee may not put himself in a position in which to be honest must be a strain on him.' " In 2 Cor. Jur., page 763, section 430, defining the rule in relation to the action of agents acquiring adverse or secret interests, it is stated as follows: "An agent is held to the utmost good faith in his dealings with his principal, and if, in the transaction of the agency, he represents persons having interests adverse to those of the principal, he generally loses his right to compensation, unless the principal, either expressly or by implication, from the facts and circumstances of the case, consents to the dual employment, or waives, or estops himself from asserting, any objection based thereon. This rule. is based on the ground of public policy, and the mere fact that the principal had knowledge that the agent was also acting for the other party, without any consent thereto, will not enable the agent to recover compensation. An agent who represents the adverse party, without his principal's consent, not only loses his right to compensation from his principal, but he cannot recover compensation from the adverse party, on either an express or an implied promise to pay, unless the principal consents not only to the dual agency, but also to the double compensation, because a secret contract by the adverse party to compensate the agent is illegal, as tending to work a fraud upon the principal." In one of the footnotes support-

ing the text just stated, we find the following taken from the case of *Bell* v. *McConnell*, 37 Ohio St. 396 [41 Am. Rep. 528], which is pertinent here: "Several reasons may be given for this rule. In law as in morals, it may be stated that as a principle, 'no servant can serve two masters, for either he will hate the one and love the other, or else he will hold to the one and despise the other.' (Luke, xvi, 13) . . . Unless the principal contracts for less, the agent is bound to serve him with all his skill, judgment and discretion. The agent cannot divide this duty and give part to another. Therefore, by engaging with the second, he forfeits his right to compensation from the one who first employed him. By the second engagement the agent, if he does not disable himself from rendering to the first employer the full *quantum* of service contracted for, at least tempts himself not to do so. And for the same reason he cannot recover from the second employer, who is ignorant of the first engagement, and if the second employer has knowledge of the first engagement, then both he and the agent are guilty of the wrong committed against the first employer and the law will not enforce an executory contract entered into in fraud of the right of the first employer. . . . The contract itself is void as against public policy and good morals, and both parties thereto being *in pari delicto,* the law will leave them as it finds them."

That an agent cannot recover commissions from either of the parties where there has been double-dealing by him, as appears in this case, was held in the case of *Glenn* v. *Rice,* 174 Cal. 269 [162 Pac. 1020]. After stating that the authorities are practically unanimous in so holding, the opinion sets forth the following reasons: "The reason for the rule is that he (referring to the agent) thereby puts himself in a position where his duty to one conflicts with his duty to the other where his own interests tempt him to be unfaithful to both principals, a position which is against sound public policy and good morals. His contract for compensation being thus tainted, the law will not permit him to enforce it against either party. It is no answer to this objection to say that he did, in the particular case, act fairly and honorably to both. The infirmity in this contract does not arise from his actual conduct in the given case, but from the policy of the law which will not allow a man to

gain anything from a relationship so conducive to bad faith and double dealing. And the fact that the party whom he sues was aware of a double agency, and of the payment or agreement to pay compensation by the other party, and consented thereto, does not entitle him to recover. He must show knowledge by both parties. One party might willingly consent, believing that the advantage would accrue to him, to the detriment of the other. The law will not tolerate such an arrangement except with the knowledge and consent of both, and will enter into no inquiry to determine whether or not the negotiation was fairly conducted by the agent. It leaves him as it finds him, affording him no relief.'' This holding is supported by a long list of authorities. (See pages 277 of the opinion from which we have just quoted.)

The facts in this case show that the plaintiff kept quiet when he should have spoken; that he did not tell the owners of the sheep that any reduction they made in the price would inure to his benefit, until after the deal had been closed. It was incumbent upon the plaintiff in this case to act fairly and honorably toward the owners of the sheep, and immediately convey to them the information that the purchaser was willing to pay $13 a head as soon as such statement had been made to him by such purchaser. Instead of so doing, he remained silent, and is in the position of seeking to benefit by his silence, when good faith and fair dealing demanded that he should speak. This is condemned by all of the authorities, and the law will leave the plaintiff just where it has found him and not permit him to gain by his breach of trust.

In the recent case of *Gordon* v. *Beck,* 196 Cal. 768 [239 Pac. 309], the court had occasion to review double-dealing on the part of the agent, and in condemning such action stated the law as follows: ''Such conduct is a fraud upon his principal, and not only will the agent not be entitled to compensation for services so rendered, but the contract or dealings made or had by the agent, while so acting also for the other party without the knowledge or consent of the principal, are not binding upon the latter, and if they still remain executory, he may repudiate them on that ground, or, if they have been executed in whole or in part, he may by acting promptly and before the rights of innocent parties have intervened, restore the consideration received, rescind

the contract and recover back the property or rights with which he has parted under it. It makes no difference that the principal was not in fact injured, or that the agent intended no wrong, or that the other party acted in good faith; the double agency is a fraud upon the principal and he is not bound." It is further set forth that such a contract is voidable at the option of either principal. The opinion from which we have just quoted cites a long list of authorities supporting the rule just stated. To the same effect is the case of *Lem* v. *Wilson*, 27 Cal. App. 512 [150 Pac. 641].

In 1 California Jurisprudence, page 810, the following summary is made of the authorities holding that no compensation can be recovered from either principal, to wit: "The authorities, with practical unanimity, declare that if an agent is engaged by both parties to effect a sale of property from one to the other, or an exchange between them, not as a mere middleman to bring them together, but active in inducing each to make the trade, he cannot recover compensation from either party unless both parties knew of the double agency at the time of the transaction."

The rules of law governing cases such as the one under consideration, and condemning double agencies under circumstances such as are disclosed by the transcript in this case, are fully set forth in 1 California Jurisprudence, page 790 et seq.

It necessarily follows from what we have said that the judgment herein should be reversed, and it is so ordered.

Finch, P. J., and Hart, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 19, 1928.

All the Justices present concurred.