[Civ. No. 12659.   Second Appellate District, Division Two.—August 19, 1940.]

EMIL F. SCHWARTING et al., Appellants, v. JOHN G. ARTEL et al., Respondents.

434

Clyde C. Triplett for Appellants.

Vernon P. Spencer for Respondents.

MOORE, P. J.—From a judgment in favor of defendants, denying plaintiffs' suit to impress a trust upon certain real property and for an accounting, plaintiffs appeal. ▄ Inasmuch as the appeal is based upon the insufficiency of the evidence to support the findings and judgment, an intimate familiarity with the facts will enliven the understanding and increase the appreciation of the conclusion at which we have arrived. After the entry of judgment defendant John G. Artel departed this life and his administrator was substituted in his place. All references are to decedent and not to the administrator.

The plaintiffs, Mr. and Mrs. Schwarting, owned and operated a ready-to-wear clothing business in St. Louis, Missouri, during and prior to 1936. At that time deceased and his wife resided in Inglewood, California. Mrs. Schwarting and Mrs. Artel are sisters. In the year 1930 Mrs. Schwarting sojourned in California, where she visited with her said sister and achieved a desire to make her home in that community. Following her return to her city of St. Louis her new wishes were communicated by letter to her sister and to Mr. Artel. Inasmuch as a removal from the great metropolis of the Mississippi Valley was out of the question unless they could dispose of their business, she and her husband requested the Artels to report any opportunities for the exchange of the St. Louis business for property in California.

Subsequently Mr. Artel advertised in Los Angeles newspapers for an exchange of the St. Louis business, but none of the offers received therefrom was seriously considered. On the 28th day of May, 1936, one Harry Goodman, a real estate

broker, addressed a communication to Artel suggesting the possibility of an exchange of the Schwarting business for the Hartman Apartments in Los Angeles, and at the same time forwarded a copy of his letter to Schwarting in St. Louis, where the Artels were visiting at the time.

The Goodman proposition at once appealed to Schwarting and he directed Artel to investigate the property upon his return to California. This Artel did, as agent for Schwarting, and the negotiations between Artel and Goodman ultimately resulted in the exchange of the Schwarting business for the Hartman Apartments. But the purchaser had no knowledge of the apartments prior to the consummation of the transaction, except such as was transmitted to him by Artel. It turned out that the party who owned the apartments was also the owner of a bungalow court which occupied an adjoining lot. Both properties were encumbered with a single loan.

As the hour approached for the final arrangements Artel conceived the scheme of disposing of a small bungalow which he owned in Inglewood. It was on a lot with a 32½-foot frontage, its rental value was $18 per month and it was appraised at $2,000. It must be said, however, that this brilliant inspiration of Artel was the fruition of a proposal which came from Goodman on June 20, 1936, when Goodman by letter suggested to Artel that Schwarting take the Hartman Apartments subject to $22,500 and the bungalow court subject to a mortgage of $5,000 in exchange for the St. Louis business.

Without communicating said proposal to Schwarting, Artel wrote Schwarting on June 29th for the first time after his return from St. Louis. His letter contained, in elaborate form, the features of the Hartman Apartments, giving it a gross value of $98,500, an equity of $76,000 and, after deducting ten per cent of that sum for repairs, it showed the value of the apartments to be $68,400. Further to enlarge upon the background of Artel's dream of gaining profits from the transaction, it appears that when Goodman first proposed the said last-mentioned exchange of the St. Louis business for the Hartman Apartments, according to the broker's testimony, he prepared at Artel's request a draft of a contract providing for the exchange which had been suggested in Goodman's letter of June 20th. In transmitting the pro-

posal to Schwarting with the letter of June 29th, in a draft prepared by his own hand, Artel utilized practically all of the phraseology contained in the draft of the contract presented to him by Goodman; but when it came to a description of the property, he included only the apartments and omitted the bungalow court which was a part of the proposal of Goodman in both his letter and his draft of contract for exchange.

Having signed the contract of exchange, Artel provided for an escrow in which the Hartman Apartments were to be conveyed to Schwarting in exchange for his St. Louis business, and as a part of the same escrow Artel instructed that the bungalow court, valued at $15,000, was to be conveyed to himself subject to an encumbrance of $5,000, and he deposited his deed as his contribution to the purchase price of the bungalow court. Also by the same escrow Schwarting's business in St. Louis, valued at $35,000 was to be exchanged for the Hartman Apartments, value at $45,000, but subject to an encumbrance of $20,000. It is thus made to appear by written evidence prepared by him that Artel, while representing Schwarting, in an effort to negotiate the exchange of his St. Louis business for property of equivalent value in California, by exercising the powers of his agency managed secretly to exchange his little bungalow, worth $2,000, for an equity in said bungalow court of the value of $10,000, whereas Schwarting's business worth $35,000 was exchanged for an equity valued at $25,000 in said apartment house.

Within a month after the close of the transaction the Schwartings took up their home in California, where they soon discovered the facts above related and subsequently filed this action.

In support of their contention that Artel, while acting as agent for Schwarting, made a secret profit for himself out of the transaction without disclosing the facts, plaintiffs urge the familiar principle that the relation of principal and agent is of a fiduciary nature and that in any transaction on behalf of his principal the agent is bound to exercise the utmost good faith and honesty. They assert that such an agent cannot take advantage of such fiduciary capacity and make a secret profit for his own benefit. (*Whitnack* v. *Ellworthy*, 63 Cal. App. 411 [218 Pac. 631]; *Curry* v. *King*, 6 Cal. App. 568 [92 Pac. 662]; 1 Cal. Jur. 794, sec. 82.) There can be

no question of the soundness or of the applicability of said principle to the facts of this case. That Artel, while acting as agent for Schwarting in a transaction where he was offered the bungalow court as one of two properties in exchange for the St. Louis business, came out with a personal net profit of $8,000 cannot be denied.

This leaves for consideration the question whether Artel disclosed all the facts to Schwarting prior to his closing the transaction as the latter's agent on July 29th. That Artel withheld a full disclosure of the facts from Schwarting appears definitely established by the following uncontroverted facts:

(1) The original offer from Goodman was to exchange the Hartman Apartments for the Schwarting business, but on June 19th, after Artel and Goodman had inspected said apartment house, Artel had raised some objection to the exchange when Goodman suggested to Artel that both the apartment house and the adjoining bungalow court might be traded for the St. Louis business.

(2) While Goodman's testimony that he made said suggestion was denied by Artel, he could not deny the receipt of Goodman's letter of June 20th wherein Goodman referred to the fact that while the negotiations had commenced for the exchange of the Hartman Apartments alone, subject to $30,000, for the business in St. Louis, yet *he was hopeful that the exchange might be made of the St. Louis business for said apartment house "subject to $22,500 and the Oak St. property bungalows and duplex property, subject to $5000"*.

(3) While Artel denied the receipt of the draft of the proposed contract for the exchange of the St. Louis business for both properties, that he did receive it is established by two conspicuous events:

(a) Artel failed to send to Schwarting either letter of June 20th or the draft of the proposed agreement, and in no way disclosed that such an offer had been made.

(b) When Artel prepared his own draft of the agreement for the exchange *he used correct orthography (contrary to his practice) and substantially all the phraseology contained in the Goodman draft.* But he omitted the description of the bungalow court and duplex, which were contained in the Goodman draft.

(4) In his letter to Schwarting of June 29, 1936, accompanying the Goodman draft of the proposed agreement of exchange, he wrote (to Schwarting) as follows: "Now this party will make the trade with other arrangements made with Owner and my self making a three corner trade, in volving other prop. and will trafe providing your stock will invoice $40,000 to $44,000 net, not including fixtures Please advise". This letter was accompanied by said *draft of the agreement for exchange in Artel's own handwriting.* From this communication and the inclosed draft of contract it appears that Artel was to receive the bungalow court; but from expressions in former communications Schwarting might very properly have gained the impression that the conveyance of the court to Artel was the result of the "three corner deal" which to that time was a mystery to Schwarting. Evidently the omission to mention his own bungalow in his letter and in his own draft of the contract was for the definite purpose of avoiding the suspicion of Schwarting, or to give Schwarting complete information that Artel was personally participating in the deal. In view of the identity of the language and the logic of the draft of contract prepared by Artel, as transmitted on June 29th, it must have been a strain upon the credulity of the trial court to give any credence to the testimony of Artel.

(5) After Schwarting had received said letter and draft of Artel under date of June 29th he wrote Artel under date of July 2d inquiring about the "three corner" trade. Under date of July 4th Artel replied thereto as follows: "I may half to put in more property or money in the three way deal, will give you all the dope just as soon as I can get it all arranged, it takes time and a lot of arranging and travelling back and forth."

(6) But on July 8, 1936, Artel again wrote Schwarting without deigning to mention anything about the "three way deal".

(7) On July 10, 1936, Schwarting answered the last-mentioned letter and said "Go ahead and see what you can do and get me the receipts and expenses, and if party will come here to inspect stock, before we go there to see the apartment, also diagram of Apartment, rentals, insurance, etc., and your proposition to him, so that I can see the deal in better light and figure same out."

(8) On July 17th Artel's answer to the letter of July 10th did not contain any mention of the bungalow court.

(9) Schwarting's answer of July 20, 1936, does not refer to the three-way deal but it did say that he would like to inspect the Los Angeles property.

(10) Artel's letter under date of July 20th again failed to mention the "three way deal", but expressed his preference that Schwarting see the property before the consummation of the exchange.

(11) On July 24th, Schwarting wired Artel to close the deal and on the same day wrote confirming Artel's authority to represent him in the transaction.

(12) The exchange agreement having been signed July 25th by Artel, in his letter of July 29th he advised Schwarting of the execution of the agreement but did not inclose a copy of the exchange agreement which provided for the exchange of the Schwarting business for the apartment house and the exchange of Artel's Inglewood bungalow for the bungalow court; also said agreement failed to reserve to Schwarting the right to inspect the Hartman apartments notwithstanding he had communicated such desire to Artel.

(13) On July 31st Schwarting in a letter inquired of Artel, "Can't you tell me the whole deal." Also in a letter to Artel under date of August 3d Schwarting stated, "If you could tell me what Seymour (optionee of Hartman apartments) is getting from Turner, Rosenberg, Tauber and also what your consideration is . . . I would be better able to work the deal."

(14) As a part of his escrow instructions by means of which said exchanges were finally consummated, Artel inserted the following provision: "This escrow is contingent upon the closing of the escrow between Schwarting and Seymour."

(15) One commission only was paid to Goodman and that was paid by Schwarting in the sum of $1,000. Artel paid no commission.

(16) Schwarting sustained a net loss of $10,000 in the transaction; Artel made a profit of $8,000 in the transaction.

(17) Artel's Inglewood bungalow was exchanged as an integral part of the single transaction in which he represented Schwarting; he had no contract for the exchange of

the Inglewood bungalow except that contained in the agreement between Schwarting and Seymour of July 25, 1936. The entire transaction was handled through one escrow and all of the facts and circumstances indicate that Artel's exchange was so inextricably interwoven with that of his principal that its consummation depended entirely upon the successful exchange of Schwarting's business for the Hartman apartments.

When confronted with the foregoing proofs indicating his infidelity to his trust, Artel testified at the trial that on July 22, 1936, he told Schwarting over the telephone that he was exchanging his Inglewood property for the bungalow court. Also, on August 11th he says he told Schwarting over the telephone that he was trading his Inglewood bungalow for the bungalow court, assuming a $5,000 mortgage.

These telephone conversations were denied by Schwarting, and in view of the numerous facts above recited which appear definitely to support the claim of Schwarting, we are unable to perceive how any reliance could have been placed upon Artel's testimony. There could be no reasonable doubt that Artel realized a profit by his transaction as agent for Schwarting.

Viewing the evidence most generously in favor of defendants, we can see no form but that of an agent who was extremely reticent with his principal concerning the subject of the agency. The offer of Goodman on June 20th to exchange both the apartment house and the bungalow court for Schwarting's business was withheld from Schwarting; the draft of a contract by Artel providing for the conveyance of the bungalow court to Artel, for which he was to pay nothing, was withheld from Schwarting; to all inquiries by Schwarting relative to the details of the three-way deal Artel made no reply. Concerning his own participation in the transaction Artel maintained a sphinx-like silence until July 22d, when he informed Schwarting that he was exchanging his bungalow in Inglewood for the bungalow court, but he withheld from Schwarting the details and manner of exchange. While the exchange agreement was executed on July 25th, never did Artel, the agent, forward a copy thereof to his principal.

On August 1st, in his conversation with Schwarting, Artel was kind enough to repose in him the gentle confidence that in taking the bungalow court he was also assuming a $5,000

mortgage. In his letter he said much to Schwarting concerning the value of the apartment house, its condition and capacity, but never did he give the details concerning the bungalow court. As to it only vague references appear in the correspondence.

When the acts of an agent have been questioned by his principal and the fiduciary relationship has been established, the burden is cast upon the agent to prove that he acted with the utmost good faith toward his principal (*Curry* v. *King, supra; Patterson* v. *Dehaven,* 88 Cal. App. 418, 425 [263 Pac. 568]) and that he make a full disclosure prior to the transaction of all the facts relating to the transactions under attack. (*Franklin* v. *Mortgage Guaranty & Security Co.,* 57 Fed. (2d) 834; *Victor Oil Co.* v. *Drum,* 184 Cal. 226 [193 Pac. 243] ; 2 Cor. Jur. 704.)

There is no substantial evidence in the record tending to prove that Artel acted with good faith toward Schwarting or that he made a full and fair disclosure of the facts relating to the bungalow court. On the contrary, all of the evidence indicates an attempt to conceal from Schwarting Artel's actual interest, as well as the secret that Artel was making huge profits from the deal. It is a rule of universal application that an agent is bound to the utmost good faith and cannot make a secret profit or take advantage of his agency for his own benefit (*Teats* v. *Caldwell,* 28 Cal. App. 206 [151 Pac. 973] ; *Whitnack* v. *Ellworthy, supra;* and where he does so he will be required to account to his principal for any such benefit or profit received by him. (*United States* v. *Carter,* 217 U. S. 286 [30 Sup. Ct. 515, 54 L. Ed. 769, 19 Ann. Cas. 594].)

It is likewise the law that where the consideration for property is paid by one person while the title is taken by another, a trust results in favor of him who advanced the consideration. (Civ. Code, sec. 853; *Thompson* v. *Bank of California,* 4 Cal. App. 660 [88 Pac. 987] ; *Kirk White & Co.* v. *Bieg-Hoffine Co.,* 6 Cal. App. (2d) 188 [44 Pac. (2d) 439].)

In those cases where an agent has secretly profited, as a matter of course, to the end that equity be done to all parties, he is entitled to be reimbursed for any portion of the purchase money advanced by him and for all expense necessarily incurred by him in protecting and conserving the property of his principal. (3 Cor. Jur., Secundum, p. 14, sec. 140.) Un-

der this hypothesis, Artel is entitled to be reimbursed in the amount of $2,000, the value of his said Inglewood bungalow, which he utilized in effectuating said exchange for Schwarting.

For the reasons assigned above, the judgment is reversed. The trial court is directed to require an accounting of the revenues earned by said bungalow court and of all disbursements properly made on its behalf; that the findings be amended in accordance with the views of this decision; that judgment be awarded plaintiffs quieting title of said court in plaintiffs, requiring defendants to convey said title to plaintiffs and awarding the net revenue so ascertained to plaintiffs less the sum of $2,000.

Wood, J., and McComb, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 10, 1940, and an application by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 17, 1940.