[Civ. No. 20782. Second Dist., Div. Two. Feb. 29, 1956.]

SEARS, ROEBUCK AND COMPANY (a Corporation), Respondent, v. FRANK R. BLADE, Appellant.

Gerald R. Knudson, Gerald R. Knudson, Jr., and Tobias G. Klinger for Appellant.

John L. Wheeler, Eugene D. Williams, Newlin, Holley, Tackabury & Johnston, Newlin, Tackabury & Johnston, George W. Tackabury and Hudson B. Cox for Respondent.

FOX, J.—By its complaint for money had and received plaintiff seeks to recover from defendant, who was its advertising manager, "kickbacks" that he had received from engravers and printers to whom he let such work on behalf of plaintiff. Judgment was rendered in favor of plaintiff for $66,089.06. Defendant appeals.

Defendant contends that (1) the major portion of the items comprising the judgment was barred by the statute of limitations; (2) the evidence is insufficient to establish the amount of such kickbacks from one of the engraving concerns; and (3) interest was computed on an erroneous basis in view of the prayer of the complaint. We have concluded the judgment must be affirmed.

Defendant was advertising manager of the retail stores in plaintiff's Los Angeles group. He assumed this position in August, 1929, and continued in it (except for one year of military service) until December 10, 1951, when it was discovered that he had been receiving kickbacks from engravers and printers with whom he had been doing business for plaintiff. It was his job to "produce the advertising." As an executive of Sears he received bids for the engraving work and generally determined who performed such services for Sears. He approved the bills and allocated the advertising costs among the 12 stores of the group. Payment was made

on his approval after going through the auditing department. Defendant handled any complaints that arose with respect to advertising. His immediate superior was the sales promotion manager.

From 1937 to the summer or early fall of 1949 defendant turned all of Sears' engraving work to Metropolitan Engravers.[1] At this latter point defendant began to give some of the engraving business to Barnard and Quinn Company,[2] at the suggestion of Mr. Plummer who had become sales promotion manager in March, 1949. During 1950 and 1951 both of these concerns received from defendant substantial engraving business for Sears. From 1937 to December 10, 1951, (when defendant's services were terminated by Sears), defendant received from Metropolitan a total of $34,150. In a little more than two years he received $8,212.65 from Barnard and Quinn. In 1948 defendant began receiving kickbacks from a publishing company for printing that he ordered for Sears. From this source he received $4,270.03. In 1948 defendant received a kickback of $50 from another printing concern. The total of such sums thus appropriated was $46,682.68.

Although the complaint prayed for interest from December 1, 1951, the court allowed interest at 7 per cent "from the first of January of each year next succeeding the date of receipt of such sums for the entire amount received during the preceding year until the date of the decision in this case, to wit, June 16, 1954." The interest thus calculated amounted to $19,406.38.

Sears did not have actual knowledge of these payments to defendant until it concluded an investigation early in December, 1951. A three hour conference was then held with defendant on the 10th at which he admitted receiving payments from the engravers. The investigation resulted from information that came to President McConnell of Sears from the president of a Chicago bank. This information[3] was

---

[1] From 1945 through 1951 the account appears to have been in the name of Metropolitan Mat Service, but they were under the same management, one being a subsidiary of the other.

[2] The name of this company was changed to Barnard Engraving Company when Mr. Quinn severed his connection.

[3] The initial report indicated the kickback was in connection with printing that Sears purchased. No mention was made of engraving. Later it developed that this portion of the report was erroneous—that in fact the kickbacks referred to in the report related to the engraving business.

passed on to A. T. Cushman, vice-president of Sears, for the Pacific Coast, with the request that he have the matter investigated. This was in the latter part of May, 1951. The investigation followed in due course.

When Mr. Plummer became sales promotion manager in March, 1949, various representatives of engraving concerns called on him in an effort to get some of Sears' business. They represented that they could save Sears a lot of money, do a good job and give good service. When Plummer discussed with Blade the idea of giving their engraving work to two or three companies Blade discouraged it on the ground that Metropolitan was equipped to give a more prompt service than others and this was important to Sears, and that dividing the business would lead to difficulties and delays. Quinn, of Barnard and Quinn, called on Plummer a number of times in his campaign to get part of Sears' engraving business. Finally Plummer suggested an order be placed with Barnard and Quinn on a trial or experimental basis. Sometime thereafter during the summer Plummer directed that Barnard and Quinn be given a portion of the engraving business.

In August, 1949, Quinn told Plummer that there was a payoff to his advertising manager. Plummer asked him if he could prove that. Quinn said, "No—I can't prove it, but I think it is going on. I'm sure it is going on." Plummer told him, "If you have any proof of that accusation I would like to have it." Quinn never provided him with any additional information on that subject. Plummer did not investigate this charge because Quinn, "by his own admission had nothing to prove that statement at all." Plummer just considered Quinn's statement as "one of the 'outs' trying to get 'in.'" Plummer regarded Blade as "a very excellent advertising manager." He observed that "Blade lived in rather moderate circumstances," so far as housing accommodations were concerned, "at a housing development adjacent to Sears." He went home for lunch each day; he dressed neatly but not expensively; had no extravagant habits; and drove a car that was not new. He lived "on the conservative side." Plummer knew Blade's salary and the approximate amount of his bonus. He did not observe anything in Blade's conduct or manner of living that caused him to become suspicious that he might be taking money that belonged to plaintiff.

In reply to President McConnell's request to Mr. Cushman to investigate the report of payoffs in the purchase of printing (see footnote 3), Mr. Cushman wrote in part: "About a year

and a half ago a charge was made by an engraver here in town that people were getting paid off because he was unable to get any business. I investigated this and found there was no foundation to it.'' This referred to the accusation Quinn made to Plummer which the latter, according to Cushman, conveyed to him. Cushman testified he had a check made of Blade by the personnel department sometime early in 1945 or 1946. He found that Blade ''lived a normal life, and that he was a good man.'' Cushman further testified: ''I had him (Blade) checked that once'' (in 1945 or 1946) and ''then I made my own checks as far as the reports were concerned, from then on,'' and ''that continued up until'' he (Cushman) received the report from President McConnell. Up to that time Cushman had not ''learned anything as a result of his checks'' on Blade and he ''had no information of any facts'' which caused him to believe or suspect that Blade was taking money from persons with whom he was dealing on behalf of Sears.

Plaintiff's complaint consists of a common count for money had and received. A writ of attachment was issued and a levy made. Defendant pleaded the two-year statute of limitations (Code Civ. Proc., § 339, subd. 1). The court found that no part of the cause of action was barred by the statute.

In approaching his argument on the statute of limitations, defendant points out that by suing on a common count for money had and received and by causing a writ of attachment to be issued, the plaintiff had elected to waive the tort by which defendant acquired the money in question and to rely on the promise the law implies to pay over to his employer the funds he had wrongfully obtained (*Philpott* v. *Superior Court,* 1 Cal.2d 512 [36 P.2d 635, 95 A.L.R. 990]; *McCall* v. *Superior Court,* 1 Cal.2d 527 [36 P.2d 642, 95 A.L.R. 1019]; *Steiner* v. *Rowley,* 35 Cal.2d 713 [221 P.2d 9]), and that an action on a contract not founded upon an instrument in writing must be brought within two years. (Code Civ. Proc., § 339, subd. 1.) Defendant therefore concludes that the recovery against him should be limited to payments received by him within the two years preceding December 10, 1951, the date on which this action was filed. He then argues that the statute cannot be tolled to permit recovery of payments received prior to December 10, 1949, since the statute does not expressly so provide, and, as an alternate proposition, he argues that the evidence is insufficient to toll the statute. The cases do not support defendant's position.

■ It is unmistakably clear that over the years Blade had fraudulently concealed the facts upon which plaintiff's action and right of recovery are based. Such fraudulent concealment tolls the statute of limitations until plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the facts on which its cause of action is based and then the applicable statute commences to run. The rule is admirably stated in *Kimball* v. *Pacific Gas & Elec. Co.*, 220 Cal. 203, at page 210 [30 P.2d 39] : "We are of the opinion, however, that independent of statute, a fraudulent concealment by the defendant of the facts upon which a legal common-law action is based, under the proper circumstances, tolls the statute until discovery and that upon discovery the statute applicable to that particular action (in this case Code Civ. Proc., § 340, subd. 3), then commences to run. There are cases from other jurisdictions, many of which are cited by appellant, which hold that in the absence of a statutory exception, the fraudulent concealment of the fact upon which the cause of action accrues does not toll the statute, but, in our opinion, the cases in this state and the weight of authority elsewhere support the rule that under such circumstances the statute is tolled. (See 37 Cal.Jur. 972, § 353, where many cases are collected.)"

In *L. B. Laboratories, Inc.* v. *Mitchell*, 39 Cal.2d 56 [244 P.2d 385], plaintiff's action was based on the breach of a written contract which occurred more than four years before its complaint was filed. The court held that defendant's wilful and fraudulent concealment of the facts on which plaintiff's cause of action was based tolled the statute of limitations.

In *Broadway Federal etc. Loan Assn.* v. *Howard*, 133 Cal. App.2d 382 [285 P.2d 61], plaintiff sought to recover secret profits and rebates which defendant received during the time he was president of plaintiff. The amended complaint, and every particularized count thereof, was for money had and received, *ex contractu*, plaintiff having expressly waived the torts and elected to sue on the implied promise to repay such secret profits and rebates. This court pointed out (p. 395) that defendant's relation to the various transactions was "purposely and painstakingly covered up," and that he concealed the information from the board of directors. In that factual setting we held defendant was estopped to assert the limitations of time applicable to a contract implied in law.

In *Pashley* v. *Pacific Elec. Ry. Co.*, 25 Cal.2d 226 [153 P.2d

325], *Boyer* v. *Barrows*, 166 Cal. 757 [138 P. 354], and *Parmely* v. *Boone*, 35 Cal.App.2d 517 [96 P.2d 164], it is emphasized that *in all cases* a fraudulent concealment of the facts upon the existence of which the cause of action accrues, is a good answer to the defense of the statute of limitations. As the Supreme Court concludes in the Pashley case, *supra,* page 232: ''The rule is applicable in this state whether or not the action itself be based on fraud.''

Defendant emphasizes the fact that a writ of attachment was issued in the instant case and asserts that the statute of limitations may not be tolled by the fraudulent concealment of the cause of action by defendant where plaintiff has invoked the provisional remedy of attachment. He attaches undue significance to this fact. The issuance and levy of the writ merely provides conclusive proof of plaintiff's election to proceed upon his contractual remedy. (*Steiner* v. *Rowley, supra.*) The invocation of this provisional remedy does not affect plaintiff's right to avail itself of defendant's fraudulent concealment as a basis for tolling the statute of limitations. *Acme Paper Co.* v. *Goffstein,* 125 Cal.App.2d 175 [270 P.2d 505], a strikingly similar case, is a complete answer to defendant's argument. In that case defendant was an employee of plaintiff . Over a period from 1948 to 1952 he was engaged in cheating his employer by representing that merchandise had been bought from one Kahn from time to time and obtaining checks in payment thereof upon which he forged Kahn's endorsement and cashed the checks. The complaint was, as here, in the form of ''a common count for money had and received.'' An attachment was levied, as in the instant matter. The tolling of the statute of limitations was also an issue in the case. What the court had to say on that question is particularly apposite here. At pages 179 and 180 the court stated: ''The statute of limitations is not a bar to this action, although it sounds in contract. Even where an express contract was the subject of the action rather than a contract implied in law, the Supreme Court has held that fraud would toll the running of the statute on the cause of action for breach thereof when 'The breach was accomplished underhandedly, by secret confederacy with another, and the use of his name to cloak the movements of the defendant . . .' (*Gregory* v. *Spieker,* 110 Cal. 150, 153 [42 P. 576, 52 Am.St.Rep. 70].) When, as here, the contract sued upon relies for its existence upon the rule of law that implies a contract to repay money that should not in good conscience

be kept by appellant, the language quoted is strikingly apposite. Appellant used Kahn's name and his own false representations as to the source of goods purchased to 'cloak the movements of the defendant' and concealed the fact that checks given to him for delivery to Kahn were in fact delivered to another and the proceeds divided with defendant. Upon discovery of the fraud this action was promptly filed.''

Defendant's fundamental fallacy is his uncritical assumption (based upon a misconception of the import of *Steiner* v. *Rowley,* 35 Cal.2d 713 [221 P.2d 9]) that because plaintiff has elected to pursue a quasi-contractual remedy founded on the promise to pay which the law implies, it may not avail itself of defendant's fraudulent concealment of the cause of action to prevent the running of the applicable statute of limitations. The cases herein discussed thoroughly refute this contention. They unequivocally demonstrate that in actions based on negligence, malpractice, breach of written contract, and in various types of restitutionary actions brought upon the common count to recover benefits tortiously acquired, defendant's undiscovered fraud or fraudulent concealment will toll the statute of repose. Though fraud is not the grava men of such actions, the plaintiff is not precluded in a proper case from relying upon the fraud or concealment which permeated the transaction, to toll the particular limitation provision germane to his action. *Steiner* v. *Rowley, supra,* simply holds that a plaintiff who, by running an attachment, has elected to waive the tort and sue upon an implied contract, is estopped to pursue a cause of action sounding in fraud. Such election also precludes him from obtaining a measure of damages appropriate to a tort action. It does not in any way inhibit his right to use the other party's fraudulent concealment as an answer to the latter's defense that the statute of limitations bars the claim. (*Kimball* v. *Pacific Gas & Elec. Co.,* 220 Cal. 203, 211 [30 P.2d 39]; *L. B. Laboratories, Inc.* v. *Mitchell, supra; Broadway Federal etc. Loan Assn.* v. *Howard, supra; Boyer* v. *Barrows, supra; Parmely* v. *Boone, supra; Acme Paper Co.* v. *Goffstein, supra;* and *Pashley* v. *Pacific Elec. Ry. Co., supra.*)

In support of his argument that the evidence is insufficient to sustain the finding that no part of plaintiff's cause of action is barred by section 339, subdivision 1, Code of Civil Procedure, defendant relies on the testimony that in August, 1949, Quinn told Plummer, in effect, that Blade was being

paid off by the engraving suppliers. He then argues that if Sears had made an investigation at that time, it would have discovered these payoffs. Defendant therefore concludes "that Sears knew everything in 1949—more than two years before this action was filed."

Whether Plummer acted as a reasonably prudent man in not investigating Quinn's charge must be viewed in the factual setting in which it was made. Evidently Quinn was earnestly trying to get some of Sears' engraving business and these efforts had gone on for some months after Plummer became sales promotion manager. Quinn had gotten an experimental or test order about June but had received no further business of consequence. In these circumstances Plummer's appraisal of Quinn's statement as "one of the 'outs' trying to get 'in'" is not unreasonable, particularly in view of the latter's admission that he had nothing at all to prove his charge, his failure to produce any proof of his accusation though invited to do so by Plummer, and the latter's knowledge of Blade's modest living circumstances, and his apparent frugality. "When the facts are susceptible to opposing inferences, whether a party had notice of circumstances sufficient to put a prudent man on inquiry as to a particular fact, and whether by prosecuting such inquiry he might have learned such fact, are questions of fact to be determined by the trial court." (*Tognazzini* v. *Tognazzini*, 125 Cal.App.2d 679, 687 [271 P.2d 71].)

Under this rule we cannot say as a matter of law that plaintiff was required to investigate the accusation and that plaintiff is chargeable with knowledge of Blade's kickbacks in 1949. It must be borne in mind that defendant was plaintiff's advertising manager and represented plaintiff in its contractual dealings with the parties from whom he was receiving the rebates or payoffs. As plaintiff's agent[4] he occupied a confidential status akin to that of a fiduciary (2 Cal.Jur.2d, Agency, § 104, p. 771.) He was bound to a duty of good faith towards his principal and was precluded from making secret profits for his own benefit from the subject matter of the agency. (*Schwarting* v. *Artel*, 40 Cal.App.2d 433, 436 [105 P.2d 380]; *Whitnack* v. *Ellworthy*, 63 Cal.App. 411, 422 [218 P. 631].) In cases involving confidential relationships, "it is recognized that facts

---

[4]Civil Code, section 2295, provides: "An agent is one who represents another, called the principal, in dealings with third persons. Such representation is called Agency."

which would ordinarily require investigation may not excite suspicion, and that the same degree of diligence is not required." (*Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412, 440 [159 P.2d 958], and cases cited; *Lee* v. *Hensley,* 103 Cal. App.2d 697, 704 [230 P.2d 159].)

█ Furthermore, there is evidence that Mr. Cushman, plaintiff's vice president, did investigate this charge but discovered no foundation for it. He mentioned it in his reply to Mr. McConnell's initial request that he investigate reports of payoffs in connection with Sears' purchase of printing. There was also evidence that Cushman had the personnel department make a spot check on Blade in 1945 or 1946 and report thereon to him, and that thereafter he made his own checks on Blade until he received the report on asserted kickbacks for printing from President McConnell in May, 1951. Up to that time there was nothing that caused Cushman to be suspicious that Blade was taking money from persons with whom he dealt on behalf of Sears. It is thus apparent that there is ample evidentiary support for the finding that no part of plaintiff's cause of action was barred by the statute of limitations, for the suit was filed immediately upon discovery of Blade's receipt of kickbacks.

Defendant points to a conflict in the testimony of Plummer and Cushman as to whether the former advised the latter of the Quinn charge, and to inconsistencies in Cushman's testimony as to what investigation, if any, he had made. █ It was, of course, for the trial court to pass upon the credibility of the witnesses, resolve conflicts and inconsistencies in the testimony, and determine the weight to which it was entitled. (*Dillard* v. *McKnight,* 34 Cal.2d 209, 223 [209 P.2d 387, 11 A.L.R.2d 835].) This rule also applies to conflicts and inconsistencies in the testimony of an individual witness. (*Showalter* v. *Western Pac. R. Co.*, 16 Cal.2d 460, 479 [106 P.2d 895] ; *Peterson* v. *Peterson,* 74 Cal.App.2d 312, 319 [168 P.2d 474].)

Defendant complains that "there is nothing in the complaint or in the findings to indicate fraud sufficient to toll the statute of limitations." It is not essential that there should be such facts either in the complaint or in the findings. ██ Since the plaintiff proceeded on the promise implied in law, it was proper to plead its cause of action in the form of a common count for money had and received. The statute of limitations was an affirmative defense to be set

up by the defendant. It is therefore obvious that it was not necessary for plaintiff to plead facts which would toll the statute. (*Adams* v. *Harrison,* 34 Cal.App.2d 288, 293 [93 P.2d 237] ; *Minor* v. *Baldridge,* 123 Cal. 187, 190 [55 P. 783].)

As to the findings, the court found that no part of plaintiff's cause of action was barred by the statute of limitations. This express finding sufficiently disposes of the defense based on the statute. (*Weaver* v. *Grunbaum,* 31 Cal. App.2d 42, 52 [87 P.2d 406].) Inherent in this finding is the implied finding that the statute of limitations has been tolled by defendant's fraudulent concealment of the facts giving rise to plaintiff's cause of action, and, as we have previously pointed out, there is ample evidence to support such an implied finding. "There is no error in the failure of the trial court to make an express finding upon an issue if it is implicit in the findings made . . ." (*Haigler* v. *Donnelly,* 18 Cal.2d 674, 677-678 [117 P.2d 331] ; *Richter* v. *Walker,* 36 Cal.2d 634, 640 [226 P.2d 593].) Illustrative of this principle, in an analogous context, is the statement of this court in *Wilkman* v. *Banks,* 124 Cal.App.2d 451, 457 [269 P.2d 33] : "By its finding of no laches, the court impliedly found that nothing had occurred to put respondents on notice of a violation."

Defendant asserts there is no evidence to justify the finding as to the amount of money received by him from Barnard and Quinn. With that assertion we cannot agree.

The court found Blade received $473.83 in 1949; $2,762.49 in 1950; $4,976.33 in 1951. At the outset checks representing the various payments were made out to cash. Quinn was the salesman on this account until he severed his connection with the company. Barnard testified that Quinn instructed the bookkeeper as to the amounts for which the checks should be made. The checks were cashed and the money placed in envelopes. Although Barnard did not count the money, he stated "I took that money, and gave it to Mr. Blade." Miss Davis, bookkeeper for Barnard and Quinn, read into the record the face amount of seven checks (all dated in 1949) which totaled $473.83, the amount the court found Blade received in 1949. These checks and the proceeds therefrom appear to have been handled in the above described fashion. It is a reasonable inference that Blade received the full amount of these seven checks in 1949.

Early in 1950, Quinn developed the idea of having an ac-

count set up in the books of the company under the fictitious name of Franklyn Art Service as a means of handling these payments. He instructed the bookkeeper to make the checks payable to the Franklyn Art Service. She gave them to Quinn for his and Barnard's signatures. "They were cashed" according to Barnard and he was "given the cash in an envelope" and he turned these envelopes containing the money over to Blade. Appropriate entries reflecting these checks were made in the books to the account of the Franklyn Art Service. Blade admitted receiving payments from Barnard from time to time in the form of cash in an envelope. He did not, however, know the total thereof. The amounts varied and were received at irregular intervals. They were to represent 15 per cent of the Sears' business that Blade turned to Barnard and Quinn. Since the bills came to Blade for approval, it was a simple matter for him to determine whether he was getting his agreed 15 per cent. Knowing that he had a ready means of figuring the amounts coming to him from time to time Barnard and Quinn would not be likely to "short change" him in their payments, for it might well interfere with the relationship and the amount of business they would get in the future. It does not appear that anyone other than the principals had anything to do with these transactions once the checks were drawn except to make the proper book entries. The amounts of the checks payable to the Franklyn Art Service and the dates on which they were credited to that account were stipulated by counsel. From the foregoing it is a reasonable inference that Blade received the amounts covered by the stipulation. The difficulty with defendant's argument on this point is that he would have us draw inferences contrary to those drawn by the trial court. This an appellate court is not at liberty to do.

 Defendant attempts to raise on appeal the defense of "unclean hands." His argument is that even if his fraudulent concealment would have tolled the applicable statute of limitations plaintiff has disentitled itself from relying thereon because it did not come into court with "clean hands." He bases this on the fact that an attachment was issued and levied pursuant to plaintiff's attachment affidavit reciting that defendant and his wife[5] were indebted to it in

---

[5] A nonsuit was granted upon the motion of Nella Blade, defendant's wife.

the sum of $75,000 plus interest, while at the time of trial plaintiff filed an amended bill of particulars stating that defendant alone was indebted to it in the sum of $46,682.68. Defendant now argues that this discrepancy in figures constituted a fraud upon the court and an abuse of process and should have precluded plaintiff from availing itself of defendant's fraudulent concealment to toll the limitations period. Defendant's strained attempt to invoke the equitable doctrine of ''unclean hands'' in the instant context is both specious and unsound. Assuming, *arguendo*, that the doctrine is applicable, this defense was neither pleaded nor, so far as the record discloses, suggested in any fashion to the trial court. This defense must ordinarily be raised in the trial court to be available, and cannot, as here, be raised for the first time on appeal. (*Watson* v. *Poore,* 18 Cal.2d 302, 311-312 [115 P.2d 478]; *Stone* v. *Lobsien,* 112 Cal.App.2d 750, 758 [247 P.2d 357]; *Scannell* v. *Murphy,* 82 Cal.App.2d 844, 849 [187 P.2d 790].) It has been held in one case, *Katz* v. *Karlsson,* 84 Cal.App.2d 469 [191 P.2d 541], that in a clear case involving flagrantly unconscionable conduct, a court may *sua sponte* apply the clean hands doctrine. But this is patently not such a case. The final judgment of the court awarded plaintiff a sum in excess of $66,000. This is reasonably close to the claim asserted in its complaint and in its original attachment affidavit. That plaintiff in its attachment affidavit and in its amended bill of particulars recited that defendant was obligated in differing amounts was not so much an indication of bad faith on its part as a reflection of its confusion due to defendant's adroitly surreptitious *modus operandi.* The rational explanation is that plaintiff, while groping for the true extent of defendant's peculations, took general and incomplete information immediately available to it and attempted without benefit of audit to ascertain defendant's indebtedness to it. There is obviously no such discrepancy between the judgment and the amount sought to be secured by the attachment proceedings as to suggest bad faith in any degree on the part of plaintiff. There is no requirement that an attaching plaintiff must be able to fix with mathematical exactitude the amount of the claim asserted in his affidavit. (*Peninsula etc. Co.* v. *County of Santa Cruz,* 34 Cal.2d 626, 631 [213 P.2d 489]; *Lewis* v. *Steifel,* 98 Cal.App.2d 648, 651 [220 P.2d 769].) In the factual setting before us, the ''unclean hands'' strictures ascribed to plaintiff have a singularly hollow ring.

As his final point, defendant contends that the court erred in awarding plaintiff interest upon the money he received prior to December, 1951, and at a rate in excess of 6 per cent per annum. The complaint prayed for judgment in the sum of $75,000 "with interest thereon from the first day of December, 1951 . . . and for such other and further relief as may by the court be deemed just and proper." Plaintiff's affidavit for attachment and the writ of attachment claim interest on the amount due at the rate of 6 per cent from December 1, 1951. It is not disputed that defendant's obligation is of the character upon which the law awards interest from the time the money received was payable to plaintiff. However, defendant argues that in view of the specific prayer and the averments in the attachment proceedings, the court incorrectly awarded interest on the sums he received prior to December 1, 1951, and erred in computing the interest allowed at the rate of 7 per cent. In so doing, defendant misconceives the rules uniquely applicable to the allowance of interest as distinguished from the recovery of other types of damages.

█ Interest is in the nature of damages which the law allows for the wrongful detention of money which should be turned over to the person entitled to it. (Civ. Code, § 3287; *Nesbit* v. *MacDonald,* 203 Cal. 219, 222 [263 P. 1007]; *Hargett* v. *Gulf Ins. Co.,* 12 Cal.App.2d 449, 458 [55 P.2d 1258]; *Cook* v. *Western Trust etc. Bank,* 137 CalApp. 436, 440 [30 P.2d 1006].) █ Unlike other items of special damage, no evidence is necessary to establish a plaintiff's right to the legal rate of interest as damages for the wrongful detention of his money. (*Gray* v. *American Surety Co.,* 129 Cal.App.2d 471, 475 [277 P.2d 436].) █ It is well established, consistent with the liberal rule enunciated in section 580 of the Code of Civil Procedure,[6] that in a contested case interest may be awarded, if the plaintiff is entitled thereto, notwithstanding the complaint contains no prayer for interest. (*Perry* v. *Magneson,* 207 Cal. 617, 622 [279 P. 650]; *Katz* v. *Enos,* 68 Cal.App.2d 266, 278 [156 P.2d 461]; *Hill* v. *New York Life Ins. Co.,* 38 Cal.App.2d 627, 637 [101 P.2d 752]; *Deaux* v. *Trinidad Bean & Elevator Co.,* 8 Cal.App.2d 149 [47 P.2d 535]; *Durbin* v. *Hillman,* 50 Cal.App. 377, 382 [195 P. 274].) █ Likewise, in contested action, where

---

[6]Code Civ. Proc., § 580, reads:
"The relief granted to the plaintiff, if there be no answer, cannot exceed that which he shall have demanded in his complaint; but in any other case, the court may grant him any relief consistent with the case made by the complaint and embraced within the issue."

interest is prayed for as of a particular day, the court may award interest as of a time antedating the date specified in the prayer if the interest is otherwise allowable. (*McKesson* v. *Hepp,* 62 Cal.App. 619 [217 P. 802].) The rationale of these cases is the simple proposition that in a contested action on a money claim which can be made certain by calculation, the matter of interest for the withholding of the money is "embraced within the issue" (Code Civ. Proc., § 580) and the appropriate interest may be allowed even though not prayed for or the prayer is for less interest than the evidence shows the plaintiff to be entitled. The legal rate of interest in California for the detention of money is 7 per cent per annum. (*Gray* v. *American Surety Co., supra.*) Where, as in the instant pleading, there is a prayer for "interest" without specifying the rate, it is deemed a prayer for legal interest. (*Nesbit* v. *MacDonald, supra.*) There was thus ample authority for the judgment awarding interest at the legal rate from the time the particular obligation to pay arose. In conformity with exemplary practice, the court added the interest accruing from the time defendant became obligated to turn over his illicit gains to the principal amounts found owing and entered judgment for the aggregate. (*Boscus* v. *Bohlig,* 173 Cal. 687, 691 [162 P. 100].)

The judgment is affirmed.

Moore, P. J., and Ashburn, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 25, 1956.