[Civ. No. 21582.   Second Dist., Div. Two.   July 30, 1956.]

Estate of JAMES E. MILLER, Deceased.   ROBERT C. KIRKWOOD, as State Controller, et al., Respondents, v. CAL H. OLSEN, as Administrator With the Will Annexed, etc., Appellant.

Baker, LeBel & McNairy for Appellant.

Robert C. Kirkwood, as Controller, in pro. per., Walter H. Miller, Senior Inheritance Tax Attorney, Conroy & Conroy and William U. Handy, for Respondents.

FOX, J.—The basic issue in this case is whether James E. Miller made a gift in contemplation of death to his brother, Stewart S. Miller, of $22,760.

James passed away on August 3, 1950, and the Bank of America was appointed executor of his estate. Stewart died on March 14, 1951, and Cal H. Olsen was appointed administrator with will annexed of his estate.

The bank, as executor of the estate of James, filed its return with the duly appointed inheritance tax appraiser and also its return with the Internal Revenue Department stating that Stewart had received a gift of $22,760 from James in contemplation of death. On the basis of these returns, the inheritance tax appraiser filed his reports and an inheritance tax was paid, and in the latter part of 1951 a federal estate tax was paid.

An amended report of the inheritance tax appraiser was filed, and thereafter, on February 5, 1954, he filed a second amended report which showed a transfer to Stewart from James of $5,000 only. The bank, as executor of James' estate, filed objection to the second amended report of the

appraiser claiming there had been a transfer in contemplation of death by James to Stewart of $22,760 cash. The objections of the bank as executor were supported by the State Controller and were sustained by the findings of the trial court. The court thereupon made an order that, among other taxable transfers, Stewart received from James a gift of $22,760 in contemplation of death and fixed the tax thereon. The administrator of Stewart's estate has appealed from this order.

Based on its determination in the inheritance tax matter, the court made an order apportioning the federal estate tax. The administrator of Stewart's estate has also appealed from the order of apportionment.

James had accumulated property valued in excess of $600,-000, out of which he had established a trust of more than half a million dollars. His brother Stewart, who was his closest relative, was to receive the largest individual benefits therefrom, viz., $500 per month. James also provided a $200 monthly income for Stewart's son John. Stewart, on the other hand, was a man of modest means, retired on a small pension, and lived in a five-room house which he purchased after the first world war. His mode of living was "very conservative, very simple."

James was afflicted with cancer and after a previous hospitalization he returned to the Cedars of Lebanon Hospital in Los Angeles. On July 27, 1950, while he was in this hospital, Stewart presented to the Bank of America for redemption certain government bonds issued in the name of James. Stewart was given a cashier's check for $22,760 payable to James; Stewart returned to the bank with the check duly endorsed by James and received $22,760 in cash. He gave this money to James while the latter was in bed in the hospital. Seven days later, on August 3, 1950, James died without having left the hospital. No part of the money was found among the effects of James after his death.

A cousin, John Waters, who visited James in the hospital just before he died, testified his mind was clear at that time. Waters visited him frequently during the last few days of his life. These included visits after July 27th.

After James had passed on Stewart either lived in or had access to his brother's home. There he exhibited a large sum of money to his attorney and friend, Mr. Crowley. It was in a metal box approximately 18 to 20 inches long, 10 inches wide and 5 inches deep. It was "about three quarters full"

of "packages . . . of fifty and one hundred dollar denominational bills—U. S. currency . . . There were a great many packages of these bills and the bills had little paper circlets around them." Stewart took the box out of the closet and after exhibiting its contents to Crowley put it back in the closet and locked the door. When he showed the contents to Crowley he remarked, "There's $40,000.00 in there."

Stewart told his friend Crowley at a dinner that he had gotten some money from his brother James. He did not, however, state the amount. In response to an inquiry as to whether Stewart mentioned when he had gotten it, Crowley testified "he stated something generally about going to the hospital while Jimmy was there and getting some money from him."

After Stewart's death John Waters, his cousin, found $6,000 with a band around it in one hundred dollar bills in a metal box in the same closet in the James Miller home. Stewart had the key to this box. It was turned over to Waters by Stewart's widow, who has since passed away also. This money went into the estate of Stewart.

When a representative of the bank inquired of Stewart whether he knew what happened to the proceeds of the bonds, he stated on two or three occasions that he delivered them to his brother at the hospital but that he did not know what became of them after that. Later, however, Stewart told him that "Jimmy had given him $5,000.00 from the funds that he took down to Jimmy from the redemption of these bonds, but he didn't know what happened to the rest of the proceeds."

After the death of James, Stewart spent lavishly, particularly at the bars and on the races. His lawyer friend Crowley, who saw him frequently between September 1, 1950, and January 1, 1951, testified that one afternoon in September, at a restaurant, Stewart told him "he was betting one, two and three" on the horse races, which Stewart explained to him meant "it was one hundred dollars to win, two hundred dollars to place and three hundred dollars to show." He told Crowley he placed two such bets that afternoon. Crowley was with him on several other occasions in September, October, November and December, 1950, when Stewart told him he was betting on the races. Also, he told Crowley "he was not winning except occasionally, but it was about the only fun he had out of life at that time and he did not expect he was going to live very long." (He died on March 14,

1951.) Crowley had seen him spend as much as $100 in an evening at the bar. He had also seen him buy drinks for everybody at the bar as many as two or three times in an evening at an expense of twenty-five or thirty dollars each time. The bar he usually patronized had a special chair marked "Reserved for Stewart Miller." According to Crowley, he "always tipped rather heavily—five or ten dollars." About this time he bought a second car from his brother's estate. He also invested $3,500 in a corporation with which Crowley was identified.

The trial court found that "James E. Miller made a gift in contemplation of death to his said brother, Stewart S. Miller, of the sum of $22,760.00."

The administrator of the estate of Stewart attacks this finding as being without evidentiary support. His position, however, is not well taken.

The decision in this case turns primarily upon the inferences to be drawn from the evidence and the weight to be given thereto. In such circumstances the rule is that when different inferences reasonably can be deduced from the facts a reviewing court is without power to substitute its deductions for those of the trial court. (*Owens* v. *White Memorial Hospital,* 138 Cal.App.2d 634, 638 [292 P.2d 288].) Therefore, in reviewing the evidence all legitimate and reasonable inferences must be indulged in support of the challenged finding. (*Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689].) The weight to be accorded the evidence is, of course, for the trial judge to determine. (*Estate of Teel,* 25 Cal.2d 520, 526 [154 P.2d 384].) Our power begins and ends with a determination as to whether there is any substantial evidence which will support the conclusion reached in the court below. (*Primm* v. *Primm,* 46 Cal.2d 690, 693-694 [299 P.2d 231].)

Relying on *Field* v. *Mollison,* 50 Cal.App.2d 585, 590 [123 P.2d 603], appellant points out that the essentials of a valid gift, *inter vivos,* are: "(1) Competency of the donor to contract; (2) a voluntary intent on the part of the donor to make the gift; (3) delivery, either actual or symbolical, amounting to transfer of title; (4) acceptance, actual or imputed; (5) complete divestment of all control by the donor; and (6) a lack of consideration in return for the gift." Appellant then argues that the evidence is insufficient to support an affirmative finding as to any of these elements.

We shall therefore examine the evidence in the light of the principles stated above.

On the question of the competency of the donor, there is a presumption in its favor. (*Estate of Gordon,* 142 Cal. 125, 131 [75 P. 672] ; *Wilson* v. *Sampson,* 91 Cal.App.2d 453, 459 [205 P.2d 753] ; *Estate of Martin,* 170 Cal. 657, 673 [151 P. 138].) In the Gordon case, *supra,* the court said: "Every person is presumed to be sane and in the full possession of ordinary mental faculties." In the Wilson case, *supra,* the court remarked that "as for competency, presumptions are in favor of it [citations]." It is of course established that a presumption is evidence. (Code Civ. Proc., § 1957 ; *Smellie* v. *Southern Pac. Co.,* 212 Cal. 540, 549 [299 P. 529].) There was also testimony that James' mind was clear by Mr. Waters, a cousin, who visited him frequently while he was in the hospital and saw him just before he died. It is thus apparent that there is ample evidence to establish the competency of James. In fact, there is no suggestion to the contrary in the record.

The intent on the part of James to make a gift to Stewart finds support in the latter's statement to the representative of the bank that James gave him $5,000. This was a declaration against interest by reason of the tax consequences that would flow from the receipt of such a gift in contemplation of death. Stewart also told his attorney and friend Crowley that he received some money from James and identified the occasion as being while James was in the hospital. On the question of James' intention, the trial judge was entitled to take into account that James was on his deathbed, that he had disposed of the bulk of his estate through the trust he had created, that Stewart was his closest relative, and that the latter was a man of modest means. These circumstances lend support to the inference that James intended to make a gift to Stewart.

From the display to Crowley by Stewart of the packages of large bills in the metal box to which he had the key, the fact that none of the proceeds from the government bonds was found in James' effects in the hospital, the reckless and lavish character of Stewart's expenditures after his brother's death in comparison with his previous conservative and simple mode of living, and the presumption that Stewart lawfully came by the money he exhibited and spent, reasonably justify an inference that James gave Stewart the entire proceeds from the bonds, and not just a small portion thereof,

and that there was delivery and complete divestment of title and control over the money by James and acceptance by Stewart.

Appellant seems to take the position that if the trial judge accepted as true the statement of Stewart that his brother gave him some of the proceeds from the bonds, then the trial judge must also accept as true his statement that the amount of such gift was $5,000 only and that he did not know what became of the remainder of said funds. ▮ The trial judge, however, is not placed in such a legal strait-jacket in evaluating the testimony of a witness or the statement of a party and in weighing such testimony or statement against other facts and circumstances in the case. A trial judge may have good reason to believe a portion of a statement and disbelieve another portion—that the statement is in part true and in part untrue. ▮ Thus it is the function of the trial judge to resolve conflicts and inconsistencies in the testimony of an individual witness and determine the weight to which it is entitled. (*Showalter* v. *Western Pac. R. R. Co.*, 16 Cal.2d 460, 479 [106 P.2d 895]; *Sears, Roebuck & Co.* v. *Blade*, 139 Cal.App.2d 580, 591 [294 P.2d 140].) In the instant matter, Stewart at first steadfastly denied receiving any of the proceeds from the bonds or knowing anything about their disposition. Later he admitted that his brother gave him $5,000 out of those funds but denied any knowledge of what became of the remainder. The trial judge may well have reasoned that Stewart's early denials of receiving any part of the bond proceeds were motivated by his desire to escape tax consequences; that later he feared the bank had learned, or would learn, of his lavish spending and might attempt to establish that he had been the beneficiary of his brother's deathbed generosity with respect to the funds in question, and, if it were successful in so doing, he would thereby become liable for a substantial tax; and that he admitted receiving a gift of $5,000 as an amount that would satisfactorily account for his extravagant spending and at the same time keep at a minimum the tax consequences of his brother's gift. Thus the trial judge reasonably could believe Stewart's statement that he received a gift from the bond proceeds without being required to accept as true the further statement that he received $5,000 only and did not know what became of the balance. It was the province of the trial judge to weigh these latter statements of Stewart with the other evidence to which we have

referred and determine wherein the truth lay. This factual decision being supported by substantial evidence is binding on this court.

Appellant argues that there is no evidence to establish that the transfer of the money was without consideration. He also points out that there is a presumption "That money paid by one to another was due to the latter," and "That a thing delivered by one to another belongs to the latter." (Code Civ. Proc., § 1963, subds. 7 and 8.) These disputable presumptions are evidence (Code Civ. Proc., § 1957) for the trial court's consideration together with the other evidence in the case. However, the evidence reasonably justifies the inference that the transfer was made without consideration. We have here a wealthy brother who realizes he has only a few days to live transferring a considerable sum of money to his closest relative who has not been financially successful and for whom the brother has made substantial provision through a trust. In light of the respective financial positions of the brothers it appears highly unlikely that James was repaying or delivering money to Stewart that was either due or belonged to the latter, or that at this late date he was paying for services rendered in view of the generous provisions he had made for Stewart by means of the trust. The more reasonable inference is, under these circumstances, that the transfer was made without consideration—as a gift. It was for the trial court to weigh this inference with the evidentiary force of the presumptions on which appellant relies and decide whether this transfer was made with or without consideration. It cannot be said as a matter of law that the trial judge's factual determination that the transfer was without consideration—that it was truly a gift—is lacking in sufficient evidentiary support.

Appellant argues that no evidence was introduced to overcome the presumption of undue influence. The foundation for this argument is apparently the fact that James and Stewart were brothers. The difficulty with appellant's position is that the relation between brothers "is not *presumed* to be confidential, as is the relation between husband and wife, [and] parent and child . . ." (*Johnson* v. *Clark,* 7 Cal.2d 529, 534 [61 P.2d 767]; *Knapp* v. *Knapp,* 15 Cal.2d 237, 242 [100 P.2d 759]; *Odell* v. *Moss,* 130 Cal. 352, 356 [62 P. 555].) Hence no presumption of undue influence arises from any transaction between them merely because of their relationship.

In his final argument appellant charges the court committed error in permitting the withdrawal of a stipulation between the bank as executor of James' estate and the State Controller under date of August 25, 1952, that the transfer to Stewart by James was $5,000 instead of $22,760. The first amended report of the inheritance tax appraiser, based on this stipulation, was withdrawn. The appraiser filed a second amended report on February 5, 1954, which was not based on any stipulation but which also stated that the gift was $5,000. It is the one here in question.

Appellant was not a party to this stipulation nor was it entered into for his benefit. We may properly assume that the representatives of the bank and the State Controller honestly believed they had made a mistake in entering into this stipulation in August, 1952, and that they acted in good faith in asking the court's permission to withdraw it. In such circumstances it was clearly in the interest of justice and therefore within the sound discretion of the trial court to permit its withdrawal. Furthermore, appellant is in no position to question the court's ruling on this matter.

Since the court found that a gift of $22,760 was made to Stewart by James in contemplation of death, the estate tax was properly assessed and apportioned. (Prob. Code, § 970; *In re Buckhantz*, 120 Cal.App.2d 92, 99 [260 P.2d 794].)

The orders are affirmed.

Moore, P. J., and Ashburn, J., concurred.